# No. 25-1669

## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

_____
)
Sligo Creek Center,                          )
                                             )
    Petitioner,                        )
                                             )
    v.                                 )
                                             )
Secretary of Health and Human Services,      )
United States Department of Health and       )
Human Services,                              )
                                             )
    Respondents.                       )
_____)

On Appeal From A Final Decision By The
Departmental Appeals Board Of The
United States Department of Health And Human Services

━━━━━━━━━━━━━━━━━━━━━━━━━

### PETITIONER'S BRIEF

━━━━━━━━━━━━━━━━━━━━━━━━━

Joseph L. Bianculli
HEALTH CARE LAWYERS, PLC
5990 Deale Beach Road
Deale, MD 20751
(703) 841-9330
bianculli@healthcarelawyers.com

Counsel to Petitioner

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 25-1669        Caption: Sligo Creek Center v. DHHS et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Sligo Creek Center
(name of party/amicus)

who is _____Petitioner_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?                    ☑ YES ☐ NO
      If yes, identify all parent corporations, including all generations of parent corporations:

      Sligo Creek Center is owned by GHX TX Operations, LLC, which is owned by Genesis
      Holdings, LLC, an indirect subsidiary of Genesis Healthcare, Inc.  The entire organization chart is
      attached hereto.

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
      other publicly held entity?                               ☐ YES ☑ NO
      If yes, identify all such owners:

4.   Is there any other publicly held corporation or other publicly held entity that has a direct
     financial interest in the outcome of the litigation?              ☐ YES ☑ NO
     If yes, identify entity and nature of interest:


5.   Is party a trade association? (amici curiae do not complete this question)   ☐ YES ☑ NO
     If yes, identify any publicly held member whose stock or equity value could be affected
     substantially by the outcome of the proceeding or whose claims the trade association is
     pursuing in a representative capacity, or state that there is no such member:


6.   Does this case arise out of a bankruptcy proceeding?              ☐ YES ☑ NO
     If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
     party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
     caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
     corporation that owns 10% or more of the stock of the debtor.


7.   Is this a criminal case in which there was an organizational victim?      ☐ YES ☑ NO
     If yes, the United States, absent good cause shown, must list (1) each organizational
     victim of the criminal activity and (2) if an organizational victim is a corporation, the
     parent corporation and any publicly held corporation that owns 10% or more of the stock
     of victim, to the extent that information can be obtained through due diligence.


Signature: Joseph L. Bianculli                      Date:      June 23, 2025

Counsel for: Petitioner


- 2 -          Print to PDF for Filing

## ORGANIZATION CHART FOR GHC TX OPERATIONS, LLC
### (6.22.25)

Stockholders*

↑ 100%

**Genesis Healthcare, Inc.**

↑ 100%

**Sun Healthcare Group, Inc.**

↑ 100%  ↑

**SunDance Rehabilitation Holdco, Inc.**  ↑  Stockholders*

↑ 5.1%  ↑ 66.0%  ↑ 28.9%

**FC-GEN Operations Investment, LLC**

↑ 100%

**GEN Operations I, LLC**

↑ 100%

**GEN Operations II, LLC**

↑ 100%

**Genesis HealthCare LLC**

↑ 100%

**Genesis Holdings LLC**

↑ 100%

**GHC TX Operations LLC**

\* The "stockholders" of FC-GEN Operations Investment, LLC are also stockholders of Genesis Healthcare, Inc.

# TABLE OF CONTENTS

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Statement of Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

     A.     Regulatory Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6

     B.     Material Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

     C.     The ALJ's Decision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

     D.     The Appeals Board's Decision . . . . . . . . . . . . . . . . . . . . . . . . . . ..33

Summary of Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .37

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

     A.     The Secretary's Exhaustion Rule, As Applied In This Case, Is Unconstitutional. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

     B.     CMS Is Not Authorized To Impose Sanctions On An "Ad Hoc" Basis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

     C.     The Appeals Board's Decision Is Not Supported By The Record . . 48

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Request For Oral Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

Statement of Related Cases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

Certificate Of Compliance With Rule 32(a)(7)(b) . . . . . . . . . . . . . . . . . . . . . . . . 53

# TABLE OF AUTHORITIES

## Statutes

5 U.S.C. § 706(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

42 U.S.C. § 405(g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

42 U.S.C. § 1320a-7a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 38, 48

42 U.S.C. § 1395i-3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 6, 8, 38, 44

42 U.S.C. § 1395aa(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Md. Health General Art. § 3-103 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Md. Health General Art. §18-322 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

## Regulations
(as numbered at pertinent time)

42 C.F.R. § 483.25 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

42 C.F.R. § 483.65 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

42 C.F.R. § 483.80 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 5

42 C.F.R. § 488.301 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

42 C.F.R. § 488.404 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .41

42 C.F.R. § 488.408 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

42 C.F.R. § 488.410 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

42 C.F.R. § 488.430 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

42 C.F.R. § 488.431(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3, 4, 44

42 C.F.R. § 488.438(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

42 C.F.R. § 488.438(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .41

42 C.F.R. § 498.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 38

COMAR (Code of Maryland Administrative Regulations) 10.06.01.21(A)(9) . . . . .14

COMAR 10.06.01.21(B)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

COMAR 10.06.02(B)(13) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

## Cases – Courts

*Axalta Coating Systems, Inc. v. FAA,* 144 F.4th 467 (3d Cir. 2025). . . . . . . . . . . . .42

*Cal Turner Ext. Care Pavilion v. DHHS,* 501 F. App'x 502 (6th Cir. 2012) . . . . . . 47

*Elgin Nursing and Rehabilitation Center v. DHHS,* 718 F.3d 488 (5th Cir. 2013) . 46

*Emerald Shores Health Care Associates, LLC v. DHHS,* 545 F.3d 1292 (11th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .47

*Fagan v. DHHS,* No. TJS-23-2095, 2025 WL 1837402 (D. Md. July 2, 2025) . . 43

*Gavin v. Heckler*, 811 F.2d 1195 (7th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . .48

*Golden Living Center Mountain View v. DHHS,* 832 F. App'x 967 (6th Cir. 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .45-46

*Kisor v. Wilkie,* 588 U.S. 232 (2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 45

*Plott Nursing Home v. DHHS,* 779 F.3d 975 (9th Cir. 2015) . . . . . . . . . . . . . . . . 46

*SEC v. Jarkesy*, 603 U.S. 109 (2024) . . . . . . . . . . . . . . . . . . . . . . . . . .2, 36, 37, 39-44

*Sun Valley Orchards, LLC v. Department of Labor,* ___ F. 4th ___, 2025 WL 2112927 (3d Cir. July 29, 2025) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*United States v. Daniel James Good Real Property*, 510 U.S. 43 (1993) . . . . . . . 43

## **Miscellaneous**

*Golden Living Center - Riverchase v. CMS*, Departmental Appeals Board Dec. No. 2311 (2010) (available on DAB website, hhs.gov.dab) . . . . . . . . . . . . . . . . . . . . 36

*Britthaven at Chapel Hill v. CMS*, DAB Dec. No. 2284 (2009) . . . . . . . . . . . . . 36

76 Fed. Reg. 15106 (March 18, 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

## STATEMENT OF JURISDICTION

Petitioner, a Medicare-certified nursing facility, appeals a Decision by the Respondent Secretary of Health and Human Services' "Departmental Appeals Board" that imposed a $1,449,975 civil money penalty against Petitioner. The Appeals Board's Decision represents final action by the Secretary and is appealable directly to this Court under 42 U.S.C. § 1395i-3(h)(2)(B)(ii), which incorporates 42 U.S.C. § 1320a-7a.

## STATEMENT OF ISSUES

This case involves the botched response to a tuberculosis outbreak at Petitioner's skilled nursing facility.

The threshold issue is whether the Secretary should have offered Petitioner the opportunity for a jury trial to challenge his factual allegations that supported imposition of a $1.4 million civil money penalty ("CMP"), per *SEC v. Jarkesy,* 603 U.S. 109 (2024). This issue appears to be of first impression in this Circuit.

The ultimate issue is whether Petitioner violated any of the Secretary's regulatory "infection control" requirements in connection with the subject TB outbreak; and, thus, whether imposition of the CMP in the circumstances of this csae was "arbitrary and capricious, and not otherwise in accordance with law" under Section 706(2)(A) of the Administrative Procedure Act.

# STATEMENT OF THE CASE

At the time of the events at issue Petitioner ("the Center") was a skilled nursing facility located in Silver Spring, Maryland that was "certified" by the Secretary's Centers for Medicare and Medicaid Services ("CMS") to "participate" in the Medicare Program. The Center since has changed operators, but CMS seized and "escrowed" the entire civil money penalty ("CMP") at issue here pursuant to 42 C.F.R. § 488.431(b), and so Petitioner would be entitled to a refund (*i.e.,* has standing to pursue this appeal) if the Court sets aside or reduces the penalty.

On October 6, 2016 the Montgomery County, Maryland Health Department, acting as CMS' agent "State Survey Agency" for purposes of this case, conducted an inspection (or "survey") at the Center, following which it cited a violation of then-42 C.F.R. § 483.65, which imposed certain "infection control" requirements that are outlined below.[1] The "Statement of Deficiencies" that describes the alleged violations is at Joint Appendix ("J.A.") 188; the pertinent citation starts at J.A. 192. CMS asserted that the alleged noncompliance caused "immediate jeopardy" to residents, which is defined at 42 C.F.R. § 488.301 to mean noncompliance that poses the "likelihood" of death or serious harm to residents; that designation triggers

---

[1] CMS since has amended Section 483.65, and has relocated infection control requirements to 42 C.F.R. § 483.80; the material provisions remain similar to those at issue here.

enhanced sanctions, including, as here, enhanced CMPs, per 42 C.F.R. §§ 488.408, 488.410, and 488.438(a).

On January 31, 2017 CMS imposed a CMP in the amount of $1,449,975 for the alleged noncompliance. J.A. 115. Shortly thereafter, CMS collected, "escrowed," and continues to hold, the entire CMP per 42 C.F.R. § 488.431(b).[2]

On March 20, 2017 Petitioner filed a timely "Request for Hearing" to the Secretary's "Departmental Appeals Board" to challenge the finding of noncompliance and associated CMP. J.A. 103. As outlined below, the Secretary's regulations at 42 C.F.R. Part 498 require exhaustion of a two-level internal administrative review (first to an Administrative Law Judge, then to the Appeals Board itself) before initiating a judicial challenge to any Secretarial action, including imposition of a CMP.

In July, 2018 a Board ALJ held a videoconference hearing at which the parties offered evidence and examined witnesses. Excerpts from the transcript of that hearing are at J.A. 122-158.

---

[2] Prior to the Secretary's adoption of Section 488.431(b) in 2013, CMS was authorized to collect CMPs only following the end of administrative and judicial review. The new regulation created an incentive for the Appeals Board to delay reviewing nursing facility appeals, which cannot be appealed to court until the end of the administrative review process; as here, it now is common for cases such as this to languish for many years, while CMS holds petitioners' money.

More than two years later, on October 23, 2020 the ALJ issued his Decision, J.A. 001-060, which is outlined in Section C below.

Petitioner filed its second-level administrative appeal to the Appeals Board in December, 2020. The Board upheld the finding of noncompliance and CMP more than four years later on May 23, 2025, J.A. 061-102; the Board's Decision is summarized at Section D below. This appeal followed. Again, CMS continues to hold the entire CMP.

## STATEMENT OF FACTS

The ALJ and Appeals Board correctly noted that most of the material facts are undisputed; but, as the ALJ also wrote, a detailed review of the evidence is necessary to make sense of the parties' legal arguments.

## A.    **Regulatory Background**

Medicare-certified nursing facilities must comply with the "Long Term Care Requirements of Participation" set forth in 42 C.F.R. Part 483, which implement provisions at 42 U.S.C. § 1395i-3 and elsewhere in the Social Security Act that establish numerous clinical, resident rights, operational and other requirements.  At issue here are the "infection control" requirements as set forth in 2015 at 42 C.F.R. § 483.65; as noted, similar provisions now are at 42 C.F.R. § 483.80.  *See* discussion at ALJ Decision, pp. 4-7, J.A. 004-007.

The material provisions of then-Section 483.65 required nursing facilities to "establish and maintain" infection control policies and procedures that address the prevention, identification of, and response to, communicable diseases.  The regulation itself has never described either the substantive or procedural nuts and bolts of infection control practices, which vary by infectious agent and circumstances, and change as medical science advances; instead, a 2015 CMS "Interpretive Guideline" to the regulation provided that a facility's infection control policies and procedures

generally should incorporate standards and "guidance" promulgated by the Centers for Disease Control and Prevention ("CDC") and state and local authorities; and that facilities should establish and maintain procedures to communicate with local public health authorities, which typically have primary authority under state law to manage infectious outbreaks.[3]  While CMS "Interpretive Guidelines" are not legally binding because the agency has not promulgated them according to the notice and comment provisions of the Administrative Procedure Act, they do provide notice to regulated parties of the agency's interpretation of its regulations.

Compliance with these regulations is evaluated via periodic inspections or "surveys," usually conducted, as here, by "State Survey Agencies" (or, in this case, the Montgomery County, Maryland, Department of Health by delegation from the State) that act, under contract, as CMS' agents.  42 U.S.C. § 1395aa(a).[4]

---

[3]  CMS' "Interpretive Guidelines" to the nursing home regulations are included in a multi-thousand page online document known as "Appendix PP" to the "State Operations Manual," which is updated continually.  The pertinent excerpt from the 2015 version of the Interpretive Guideline actually is not in the record, as ALJs and the Appeals Board commonly take administrative notice of CMS manuals, but there was no dispute that the applicable Interpretive Guideline provided that facility infection control policies should conform to State and CDC requirements and guidance.

[4]  The Montgomery County, Maryland Health Department both conducts nursing home inspections and conducts TB control activities, and CMS offered testimony in this case by staff from both divisions of the Department.  Petitioner protested throughout the case that this dual function posed a conflict of interest –

42 U.S.C. § 1395i-3(h), 42 C.F.R. Part 488, and accompanying CMS Manuals, then set forth and describe an "enforcement" system under which CMS may impose sanctions, including "remedial" CMPs, based on these citations. *See* 42 C.F.R. §§ 488.430-488.440.

The Social Security Act and regulations provide that a nursing facility may contest any adverse action by the Secretary, including a CMP. 42 U.S.C. §§ 405(g) and 1395i-3(h)(2)(B)(ii) (incorporating 42 U.S.C. § 1320a-7a); 42 C.F.R. § 498.3(b)(13). As outlined below, these regulations require exhaustion of the administrative appeal process before seeking judicial review. Appeals of Board Decisions in CMP cases are directly to the Court of Appeals per 42 U.S.C. § 1395i-3(h)(2)(B)(ii), which incorporates 42 U.S.C. § 1320a-7a; that is, there is never any opportunity for a petitioner to challenge the Secretary's fact-finding in CMP cases before a jury.

## B.    Material Factual Background

This case involves the (mis)management of a tuberculosis outbreak at the Center in 2015 and 2016. As noted, the ALJ noted that much of the material

---

the nursing home inspector deflected blame for the failings of her cohorts in the TB division to the Center's staff – which compromised the credibility of the inspectors' *factual* findings, but both the ALJ and Appeals Board dismissed the matter. *See* Board Decision, p. 16 and 17 n. 21, J.A. 078-079.

chronology and evidence is undisputed, but his Decision also included an extensive discussion of that evidence, which he correctly indicated was necessary to make sense of this case.

As background, it is undisputed that TB control has been a local public health responsibility in the United States for two centuries. It likewise was undisputed that the Montgomery County, Maryland, Health Department botched its responsibility under State law to respond to and manage the Center's TB outbreak in a timely manner. Thus, as outlined in the following discussion, much of the case below involved parsing the applicable provisions of State law and CDC guidance regarding the TB control responsibilities of the local public health authority, and then considering the Center's own TB control policies and actions against those standards. Excerpts from the CDC's then-applicable TB guidelines are at P. Ex. 4, J.A. 159-170; the State's governing regulations are at CMS Ex. 38, J.A. 210-229; and the State's TB Guidelines are at CMS Ex. 39, J.A. 240-306.

Some clinical background – also undisputed – likewise is necessary for context. TB is a highly contagious infectious disease that, following exposure of an unvaccinated person, can cause acute, or "active," illness, where the person is symptomatic and contagious; or that can remain "latent," in which status a person is not sick or contagious. Most Americans are vaccinated against TB as infants, but it

is not unusual for foreign-born residents of nursing facilities (of which there were many at the Center) to test positive for exposure and "latent" TB, as was the case here. A very small percentage of persons who have "latent" TB eventually "converts" to active disease at some point. When any person – including a nursing facility resident – is diagnosed with "active" TB, the standard of care in the United States is for the individual immediately to be hospitalized, in isolation; and for the local public health authority to conduct a "contact investigation" to identify persons who may have been exposed to the infected person. Possible contacts then are tested for exposure by a tuberculin skin test ("TST") and/or quantiferon ("QFT") assay, a more complicated test administered to persons vaccinated outside the United States (which, in 2015, for technical reasons could be administered only by the County Health Department, a point that turned out to be significant in this case). For either test, two rounds of test are administered, usually six to eight weeks apart.

If a person tests positive for exposure to TB on either round of testing but does not exhibit symptoms of active disease (fever, cough, chest pain, night sweats, coughing up blood), the standard of care is to perform a diagnostic chest X-ray. If the chest X-ray does not detect active disease, the person is said to have "latent TB infection" or "LTBI." According to the CDC, the standard of care in the United States for LTBI is to monitor for symptoms (Maryland law specifically says at least

annually); and to provide a prophylactic course of antibiotics over several months, with the timing and choice of specific medication chosen by a physician on a case-by-case basis (and, in Maryland, per State regulation), since certain medications may be contraindicated for specific patients. *See* ALJ Decision, pp. 9-13, J.A. 009-013.

As noted, then-Section 483.65 required only in general terms that a facility must "establish an infection control program under which it investigates, controls and prevents infections," but the regulation itself did not set forth any clinical aspects of infection control, including the nuts and bolts of TB investigation and control, instead referring to more specific CDC and State law guidance.[5]

It is undisputed that the Center adopted and implemented a "Tuberculosis Management Policy," that mirrored State law and CDC Guidelines, the content of which neither CMS nor the ALJ critiqued. P. Ex. 6, J.A. 171-177; ALJ Decision, p. 17, J.A. 017. The Appeals Board seems to have focused on the Center's supposed violations of its own TB Policy, so Petitioner describes the Policy in some detail.

---

[5] Petitioner did *not* argue, as the Board says, Decision, p. 22, J.A. 83, that the regulation does not *apply to* TB – it obviously does, as TB is an infectious disease – but rather that the regulation itself does not specify *how* to do so; or, more specifically in this case, what were the relative responsibilities *under then-Section 483.65* of the Center and the local public health agency.

11

First, the Policy provides for TB screening and testing of residents in two circumstances – most new residents upon admission; and "post exposure," that is, after a case of active TB is discovered in any individual that could affect the Center. In either case, the Policy provides that if a resident tests positive, and also has "suspected or confirmed active, infectious tuberculosis" by positive chest X-ray or symptoms, then the resident immediately is isolated and transferred to a hospital.  P. Ex. 6, pp. 1, 3-4, J.A. 171, 173-174.

The remainder of the Policy pertains to residents who test positive for exposure but do not have active contagious infections (LTBI), and who thus remain at the Center; these are the residents at issue here.  In these cases, the Policy establishes a series of procedures.

First, the Policy provides that the Center must notify "the state Health Department [here, the County Health Department] and *follow its recommendations* for investigation *and followup*" (emphasis added).  P. Ex. 6, pp. 1, 6, J.A. 171, 175. According to the Center's Administrator Bret Stine, and Dr. John Loome, Genesis HealthCare (the then-Center manager) Senior Vice President for Medical Affairs, the intent of this provision is that Center's staff must *take direction* from the County Health Department how to respond.  Dr. Loome testified that decisions about prophylactic medications for elderly residents with LTBI can be "tricky" for the

nursing typical facility Medical Director, who typically specializes in internal medicine or geriatrics, and so the Policy is premised on a presumption that the local public health authority has greater expertise in infectious disease management. Tr. 856-865, 876-877, J.A. 136-154.

Next, the Policy provides that if either the first or second skin or QFT test is positive (as noted, two tests are administered several weeks apart), "obtain a chest x-ray and medical evaluation." P. Ex. 6, p. 3, J.A. 173. There is no dispute that every resident who tested positive for exposure received the specified chest X-ray, and that all were negative for active disease. Likewise, as discussed below, there is no dispute that the County Health Department indicated that its Medical Director, Dr. Sonya Qasba, would direct the medical evaluation, and provide resident-by-resident prophylaxis orders.

The Policy then provides, if the chest x-ray is negative, to "monitor at least annually" using a specified form (Maryland law also requires annual monitoring). Again, it is undisputed that the Center kept a roster of residents who required TB monitoring, and completed the specified annual monitoring using that form.

Finally, the Policy provides that "if chest x-ray/medical evaluation is negative for active disease, continue medical evaluation for consideration of alternative diagnosis and/or evaluation for chemoprophylaxis." P. Ex. 6, p. 4, J.A. 174.

This provision seems to be the crux of the alleged noncompliance. And here is where Maryland law is directly pertinent. The Appeals Board appears to have found that the Center's Policy somehow overrides certain specific Maryland regulations, so Petitioner outlines those regulations in detail.

Maryland regulations at COMAR 10.06.01.21B(2) provide that local health departments have the responsibility for "recommending appropriate treatment for latent tuberculosis infection" (that is, prophylaxis for patients who test positive but do not have active TB).[6] CMS Ex. 38, p. 18, J.A. 228. It is undisputed that the County Health Department's Medical Director, Dr. Qasba, thus agreed to review specific resident records, and to issue specific resident-by-resident prophylaxis recommendations, *as State law specifically required **her** to do*.[7]

In 2007 Maryland also adopted "TB Guidelines," which remained effective at all pertinent times, that provided in pertinent part that "*it is the responsibility of the*

---

[6] In Maryland, the principal responsibility for TB investigation and control is assigned to the State Department of Health, which has delegated certain responsibilities to local "Health Officers." Md. Health General Art. §§ 3-103; 18-322 et seq.; COMAR 10.06.02B(13); CMS Ex. 38. In Montgomery County, Maryland, the Chief of Public Health Services of the County Health Department is designated as the County Health Officer.

[7] COMAR 10.06.01.21(A)(9) actually authorizes County Health Officers to *compel* persons who have LTBI to undergo prophylaxis. CMS Ex. 38, p. 18, J.A. 228.

*local health department* to ensure that all persons who are suspected of having tuberculosis are identified and evaluated promptly and that an appropriate course of treatment is prescribed and completed successfully" (emphasis added). CMS Ex. 39, J.A. 249.

The ALJ wrote at various points in his Decision, *see, e.g.,* pp. 12, 41, J.A. 012, 041, that he agreed that these State law provisions represent the "standard of care."

The CDC also publishes Guidelines for TB investigation and control, most recently for purposes of this case in 2005, excerpted at P. Ex. 4, J.A. 159-170. The CDC Guidelines specifically recite that "*regardless of where a person receives medical care,* the *primary responsibility* for ensuring the quality and completeness of all TB-related services rests with the jurisdictional [public health] agency" (emphasis added). The CDC Guideline also recites that among the responsibilities of the local health department are to "medically evaluate" and "plan for treatment and followup of contacts," which is consistent with Maryland law. P. Ex. 4, p. 6, J.A. 160.

The material chronology, outlined at length in the ALJ Decision, is undisputed, but is summarized here for context.[8] In the Spring of 2015, two of the Center's staff

---

[8] The Administrative Record includes dozens of exhibits, including patient records, that illustrate this narrative; because the parties agree that the material chronology is undisputed, resident records that include personal medical

were treated for "active," or infectious, TB by the County Health Department (which inexplicably did not notify the Center at the time). Upon discovering this fact in May, 2015 (via medical leave paperwork), the Center's Administrator Bret Stine, and Infection Control Nurse Suzanne Hayden, R.N., consulted with Genesis HealthCare's Medical Director, Dr. Loome, and at his direction contacted the County Health Department, and started skin testing of residents and staff, symptom surveillance, and chest X-rays of residents who tested positive for exposure to TB. The County Health Department also began Quantiferon ("QFT") testing on foreign-born residents. CMS agreed that all of these actions met the requirements of State law and the Center's TB Policy.

On May 15, 2015 Kimberly Townsend, R.N., Director of the County Health Department Tuberculosis Control Program, and Itala Fontana, R.N., a County TB Control Nurse, met at the Center with Administrator Stein, Nurse Hayden, Dr. Loome, Dr. Ravi Passi (the Center's Medical Director at the time), Director of Nursing Funmi Odunubi, R.N., and other representatives of the Center. According to memos Director Odunubi and Nurse Hayden prepared immediately thereafter, P. Ex. 7 and 8, J.A. 178, 179, the County Health Department nurses instructed the Center staff that they – the County nurses – would "take the lead and guide the

_____

information are not included in the Joint Appendix.

Center."  It is undisputed that Dr. Passi and Nurse Hayden told the County Health Department staff at this meeting that they were not experts in TB control – the Center had not had a known case of active TB in at least 25 years – and that they specifically requested guidance from the County Health Department regarding identification of individuals who would require prophylaxis, and the logistics and timing of the necessary treatment.

It likewise is undisputed that the County staff agreed that following completion of the two necessary rounds of testing, the County Health Department's Medical Director, Dr. Qasba, would provide specific recommendations regarding the timing of prophylaxis, which residents the Center should treat, and which medications to use. Dr. Qasba agreed to review individual resident charts to ascertain whether a specific medication was contraindicated for a specific resident, and to provide specific written resident-by-resident prophylaxis orders.

Dr. Loome, Administrator Stine, and Director of Nursing Odunubi all testified that this discussion and agreement appeared to be consistent with the Center's own TB Policy, and raised no red flags for them.  For instance, Dr. Loome testified that "they were very clear" that the County Health Department would provide specific resident-by-resident orders regarding prophylaxis at the appropriate time.  Tr. 790; 879-880, J.A. 148-149.

On June 11, 2015 The County Health Department's Nurses Townsend and Fontana, and the Department's TB Unit's Medical Director, Dr. Qasba, conducted an "all staff" meeting at the Center to discuss further testing. The County Health Department representatives again indicated that "we are in charge and will give you directions." P. Ex. 12, J.A. 180.

During the Summer and Fall of 2015 the County Health Department completed the first round of QFT testing; as noted, testing requires two rounds of tests about eight weeks apart, and it is undisputed that at some point in the interim the County's Nurse Townsend told the Center that she would defer discussion of prophylaxis until after the second round of QFT testing was completed. Tr. 497-498, 1065, J.A. 122-123, 156. As the ALJ noted, there is no evidence that the County Health Department expressed any urgency about prophylaxis at any time in 2015. ALJ Decision, p. 15, 35, J.A. 015, 035.

On August 10, 2015 the Center's Quality Assurance Committee met and reviewed the progress of testing to that point; noted that all residents and staff had been tested once; and that the County Health Department would begin the second phase of its testing "soon." Again, since the two rounds of testing are supposed to be several weeks apart, the fact that the second round had not yet started raised no concerns at the time.

On August 17 and 19, 2015 Nurse Hayden sent the County Health Department another list of residents and their current test status. A few days later, the Center began the second round of tests for forty residents who previously had negative TSTs. On August 27, 2015 Nurse Hayden sent the County Health Department the new test results, and chest X-rays for six residents who had tested positive (again, all negative for active disease). In her cover memo, Nurse Hayden specifically requested the County nurses to set up a time to discuss next steps.

Early in September, 2015 a County Health Department technician came to the Center to draw blood for QFTs from foreign-born staff members and eight foreign-born residents for the second round of QFT tests. However, for various technical reasons the County technician was unable to draw blood from four of the eight residents, and indicated that the Department would send a specially trained phlebotomist to do so. But the County never did so – and thus never completed the second round of testing – notwithstanding numerous inquiries by Nurse Hayden.

On September 17, 2015 the Center's Nurse Hayden asked the County Health Department's Nurse Fontana for specific guidance regarding a 20 year old resident who was being evaluated for a kidney transplant, and for certain residents who were on renal dialysis. The County's Nurse Fontana responded that her office did not have

a physician available, and that she would get back "next week." P. Ex. 18, pp. 1-2, J.A. 181-182.

On September 21, 2015 the Center's Quality Assurance Committee again discussed the status of testing, and Committee minutes indicate that the "next step will be medication management" under the County Health Department's direction. Over the next month, Nurse Hayden queried Nurse Fontana several times about the matter, and asked when the County Health Department would complete the second round of QFT testing. Nurse Fontana made no response until October 22, 2015, when she promised to do so "soon."

One peculiarity of the hearing below was that CMS insisted that the County Health Department eventually *did* send resident-by-resident prophylaxis orders at some point during this time (and the Center's staff failed to follow them). But CMS was unable to produce any documentary or other evidence that this was so, and the Center's witnesses denied ever receiving such orders. The ALJ found that the County Health Department did send the orders, but that the Center never received them, which seems odd; but he also indicated that these findings were not material to his decision. *See* ALJ Decision, p. 40 and n. 21, J.A. 040. The Appeals Board did not address this odd finding.

Dr. Babatunda Ajani replaced Dr. Passi as the Center's Medical Director in October, 2015. Monthly QA Committee minutes through January, 2016 indicate that the Center (and Dr. Ajani) continued to anticipate completion of resident testing, and still were awaiting further direction from the County Health Department.

On November 5, 2015 the Center's Nurse Hayden sent the County's Nurse Fontana additional information regarding the resident who was being evaluated for the kidney transplant (the resident's hospital physicians eventually provided prophylaxis orders, which the Center followed); and again asked about blood draws for QFTs on the last four foreign-born residents.

Nurse Fontana responded by text message: "Sometime next week. Have to coordinate with my lab person. Did Dr. Passi put residents on prophy?" Nurse Hayden immediately responded that Dr. Passi no longer was the Medical Director, and "we need to talk. Nothing has been started with the residents. We will need to coordinate process." P. Ex. 18, p. 4, J.A. 184.

As the ALJ found, there is no indication that Nurse Fontana was alarmed or even concerned by this information, as she responded, not with a recommendation or order, but with a proposal for a meeting: "We have a new MD too so maybe we can meet one afternoon and figure out a plan." In response, Nurse Hayden texted Nurse Fontana that Dr. Ajani was at the Center every Thursday. P. Ex. 18, p. 5, J.A. 185.

The County Health Department's Nurse Fontana agreed at the hearing that these communications indicated that her plan was to meet with Dr. Ajani to review the history of the investigation, and the logistics for prophylaxis. Nurse Fontana also testified that she did not, and would never have, agreed to forego the remaining four QFT tests before starting prophylaxis. Tr. 614-616; 634-638, J.A. 124-131. As the ALJ found, the County Health Department exhibited no urgency at all about either completing the second round of testing or starting prophylaxis at this time, notwithstanding Nurse Hayden's ongoing prompting.

On January 26, 2016, Nurse Hayden again inquired of Nurse Fontana what her plans were for the Center. Nurse Fontana again responded that she intended to meet with the Center staff soon "to see where we are." P. Ex. 18, pp. 5-7, J.A. 185-187. There is no evidence that anyone at the County Health Department followed up this communication, and Nurse Fontana conceded that she did not. Tr. 616, 638, J.A. 126, 131.

During this interim, the Center's nurses continued to do ongoing surveillance for signs and symptoms of active TB. In May, 2016 the Center's nurses completed the detailed annual assessments of all residents who had tested positive for exposure for signs and symptoms of active TB, and recorded no such signs for any resident.

The CMS Notice imposing the CMP, J.A. 115, recited that "immediate jeopardy" noncompliance started on June 14, 2016, which appears to correlate, at least in general terms, to a diagnosis of active TB for "Resident #1," and so Petitioner addressed that issue in some detail before the ALJ. This allegation – which appears to support the "immediate jeopardy" determination – requires some unpacking; again, the following facts are undisputed (and so, again, the Resident's medical chart is not included in the Joint Appendix to protect her confidentiality).

Resident #1 was a 72 year old woman who had a long history of chronic obstructive pulmonary disease ("COPD"), pulmonary blood clots, and other respiratory illnesses which her attending physician, Dr. Tahmina Ahmed (who was not otherwise affiliated with the Center), addressed on an ongoing basis. Resident #1 was one of the residents who had a positive PPD skin test on May 26, 2015, but a chest X-ray on May 29, 2015 indicated no active TB at that time.

In December, 2015 the Resident presented with respiratory symptoms that Dr. Ahmed diagnosed, following another chest X-ray, as pneumonia. Neither the radiologist nor Dr. Ahmed suspected active TB or ordered additional tests, and CMS did not allege any issue regarding this diagnosis. Likewise, there is no evidence that the County Health Department focused on Resident #1 as being at especially high risk

of "converting" to active TB, or provided any recommendations or orders relating to her, at any time during 2015.

On June 4, 2016 – that is, six months later – the Resident presented with a new cough with chest pain. Dr. Ahmed ordered another chest X-ray and eventually diagnosed acute bronchitis; again, neither the radiologist nor Dr. Ahmed suspected TB. Dr. Ahmed visited and assessed the Resident in person a few days later, and her contemporaneous notes indicate that the reason for the visit was "management of COPD with acute bronchitis;" that the Resident was feeling better after a few days on antibiotics; and that the Resident denied fever or chills, was eating well, and said that her cough was better, with no further chest pain.

CMS argued that Dr. Ahmed's diagnosis and orders could have been mistaken, and that the Resident actually might have been exhibiting signs of active TB in June, 2016 (or even in December, 2015). That is possible, although it is impossible to know for sure on this record, and the ALJ did not so find. But it is undisputed that the Center's nurses had identified and brought to Dr. Ahmed's attention the Resident's respiratory symptoms in both December, 2015 and June, 2016; and it is undisputed that it is not within the scope of practice of a nurse to interpret an X-ray report or to question a physician's apparently plausible diagnosis.

On August 4, 2016 – another two months later – the Center's staff noted Resident #1 coughing up blood – which *is* a sign of active TB – and so the Center immediately transferred the Resident to a local hospital, where she eventually was diagnosed with active TB. The Appeals Board speculated that the Resident "converted" to active TB because the Center did not provide her with timely prophylaxis; but there is no way to determine when she developed active TB; moreover, as noted, the Resident actually had at least three chest X-rays in 2015 and 2016 that did not suggest TB, as well as at least one course of antibiotics.

In any event, the Center's staff immediately consulted again with the County Health Department, and within days, the Center and the County Health Department begin retesting all employees and residents. By mid-September, 2016, the Center again tested all residents (by then the Center could do QFT tests); obtained chest X-rays for sixteen residents who tested positive either in new tests or had tested positive for exposure during the 2015 testing (all again were negative for active disease); and completed new surveillance reports for those residents. It is undisputed that during the second week of September, 2016 physicians from the County Health Department finally provided specific resident-by-resident written orders for prophylactic antibiotic treatment of a total of 19 residents, and the Center's staff then provided the

ordered treatment. There is no evidence that any resident aside from Resident #1 ever tested positive for active disease.

## C.     __The ALJ's Decision__

Petitioner argued to the ALJ that there really was no dispute that the Center did exactly what CMS' Interpretive Guideline to then-Section 483.65 required – that is, the Center's administrators, physicians and staff created and implemented a TB Policy that incorporated, and followed, Maryland State law requirements, CDC guidance, and the County Health Department's specific instructions regarding TB control; and that the Center's staff followed that Policy. Likewise, Petitioner argued that the County Health Department's Dr. Qasba's specific representation that she would do resident-by-resident assessments and provide prophylaxis orders was entirely consistent with all of these regulations, State laws, CMS directives, CDC guidance, and the Center's Policy. Petitioner argued that it should have been straightforward for CMS – and the ALJ – to connect these dots to find that Petitioner had followed the plain language of the regulation, as described in CMS' "Interpretive Guideline" and repeated in the Center's own TB Policy.

The ALJ did recognize that Maryland law, the CDC's TB guidance, and the Center's own TB Policy, all specifically assigned responsibility for certain aspects of TB control, including notification, testing, treatment, and followup, to the local public

health authority. ALJ Decision, p. 41, J.A. 041. But the ALJ held that he need *not* harmonize the Center's TB policy with State law or the CDC's guidance, and that he could *infer* that then-Section 483.65 imposed an *implied* obligation for the Center to *assume* certain public health responsibilities – at some undefined point – if the County Health Department failed its own responsibilities. ALJ Decision, pp. 42-47, J.A. 042-047. Thus, the ALJ ultimately held that notwithstanding the clear provisions of State law and CDC guidance, it actually was the *Center*, and, specifically, its Medical Director and Infection Control Nurse, who failed to complete *their* (implied) *regulatory* duty to initiate prophylaxis that State law specifically assigns to the County Health Department. On that basis, he upheld the finding of noncompliance with then-Section 483.65, and the CMP.

## D.    The Appeals Board's Decision

The Appeals Board's Decision is, charitably, confused. For instance, the Board apparently thought that Petitioner was challenging only a finding of noncompliance based on its supposed failure to follow specific prophylaxis orders provided by the County Health Department in 2015. Board Decision, pp. 17 n. 21, 22, J.A. 077, 082. As outlined above, CMS was unable to produce any such documents, and the ALJ wrote that he did *not* base his Decision on such a finding.

The Appeals Board also seems to have done a "de novo" review of the evidentiary record; made its own interpretations of the Center's TB Policy and the pertinent State regulations and CDC guidance; and even purported to "interpret" the ALJ's Decision. For instance, the Board held that the gist of the ALJ's Decision was that it was "not inconsistent" with Maryland law and CDC Guidance to interpret then-Section 483.65 to assign TB control responsibility to the Center. Board Decision, pp. 20-21, J.A. 081-082. That is not a fair characterization of the ALJ's discussion; and, as discussed in the text, this "ad hoc" interpretation and application of then-Section 483.65 is inconsistent with its plain meaning of the regulation, as CMS itself explained it.

Similarly, the Appeals Board noted the clinical standard of care for two courses of testing for TB exposure over several months, and the lengthy series of (apparently routine) communications between the Center and the County Health Department regarding prophylaxis; but the Appeals Board held that this course of communication, *in itself,* violated the Center's TB policy to undertake (unspecified) "prompt action."

The Appeals Board also held that there is "no evidence" that any physician was involved in what it said was *"the Center's decision"* to delay prophylaxis. This notwithstanding the (undisputed) evidence outlined above that it was the County Health Department that made that decision; and the extensive evidence regarding the

discussions among the County Health Department's Dr. Qasba, and the Center's Drs. Loome, Passi and Ajani (not to mention the County's TB control experts).

And the Appeals Board held that the Center's (apparently undisputed) observation that Maryland and CDC provisions governed the prophylaxis process was "unsupported," because the Board read those provisions *not* to address "initiation of prophylaxis" notwithstanding their plain language to that effect (what else could they address or mean?). Board Decision, pp. 16, 20, 22-23, 30, J.A. 077, 081, 083-084, 091.

The Appeals Board ultimately held that "the problem" was the Center's "deference" to the County Health Department; given this definition of "the problem," the Board held that the fact that the County failed its duties under State law is "not a defense" to the Center's failure to ensure the "prompt action" the Board says the Center's own TB Policy required. Decision, pp. 21, 28, J.A. 082, 089.

The Appeals Board likewise dismissed Petitioner's argument, addressed below, that the regulation did not put the Center on notice of the "ad hoc" ground upon which CMS would cite noncompliance. According to the Board, the Center's TB Policy required "prompt action," and so this language put the Center on notice that *its Policy* created a new (albeit implied) "standard of care" *different than, and*

*independent of,* any State law requirements or CDC recommendations. Decision, pp. 25-26, 29, J.A. 086-087, 090.

The Appeals Board also added, almost as an afterthought, that all of the foregoing analysis really is not necessary to sustain noncompliance and the large CMP, since then-42 C.F.R. § 483.25 provided that all facilities should provide "quality care." The Board held that even though CMS did not cite noncompliance with, or base the CMP upon, this provision – much less offer evidence of any applicable clinical standard – the Board could decide, "de novo," that this regulation provides a hook to penalize a facility for any clinical issue or anomaly (regardless of fault) that befalls residents. Board Decision, p. 24, J.A. 085.[9]

Finally, the Appeals Board rejected Petitioner's *Jarkesy* argument, essentially on the ground that no court had yet applied *Jarkesy* to this sort of appeal. Decision, p. 40, J.A. 101.

---

[9] The Appeals Board's odd conception of "de novo" review is based on its position that it is the "last step in the enforcement process," and thus is "not restricted to the facts and evidence that were available to CMS when it made its decision," the ALJ's findings of fact, or even the evidence in the record; and that its review is *not* comparable to the "oversight role of a federal court in reviewing agency decisions to determine if an adequate basis is articulated." *Golden Living Center - Riverchase v. CMS*, DAB Dec. No. 2311 (2010); *Britthaven of Chapel Hill v. CMS*, DAB Dec. No. 2284 (2009), available on the Board website. As outlined in the following section, this review standard highlights the *Jarkesy* issue.

## SUMMARY OF ARGUMENT

First, as outlined in Section A below, this is exactly the sort of case described in *SEC v. Jarkesy,* 603 U.S. 109 (2024), where the Seventh Amendment provides that a regulated party should be able to elect jury review of the factual allegations that support a large civil money penalty.

Second, the Secretary's allegations were not supported by the evidence; and his allegations, and his Appeals Board's Decision, illustrate numerous legal flaws.

As outlined in Section B, both the Secretary and his Appeals Board constructed (different) "ad hoc" rationales for imposing a CMP, neither of which was set forth in any regulation, "interpretive guidance," standard of care, or anywhere else that plausibly put the Center's staff on notice of that basis for noncompliance and a sanction. Indeed, the Secretary's result is directly contrary to his apparently clear regulatory "guidance" *that Petitioner followed.* Under the Supreme Court's interpretation and application of the Administrative Procedure Act in *Kisor v. Wilkie*, 588 U.S. 232 (2019), such "ad hoc" imposition of sanctions cannot stand.

Finally, as outlined in Section C, the Appeals Board's rationale and result are not supported by any quantum of evidence the record, whether evaluated under the "substantial evidence in the record, taken as a whole" standard or otherwise; and, not incidentally, make no legal, operational or clinical sense; and thus are "arbitrary and

capricious" within the meaning of Section 706(2)(A) of the Administrative Procedure Act.

## ARGUMENT

### A.   The Secretary's Exhaustion Rule, As Applied Here, Is Unconstitutional

As addressed in the following two Sections, Petitioner believes that the Appeals Board's Decision is not supported by the record.   But there also is a threshold constitutional issue that may be determinative.

When Petitioner filed its administrative appeal in 2017, that was the only way to obtain review of the Secretary's imposition of a CMP (and, not incidentally, to contest his seizure, "escrow," and holding of that CMP during the appeal, which the Appeals Board did not even address).   In essence, the Secretary interprets the "exhaustion" requirement of the Social Security Act, 42 U.S.C. § 405(g), to require any challenge to his factual or legal findings or determinations that underlie a CMP first to be presented to his Appeals Board per 42 C.F.R. Part 498 (*i.e.,* first to an ALJ and then to the Appeals Board itself).   *See* 42 C.F.R. § 498.3.[10]   42 U.S.C. § 1395i-3(h)(2)(B)(ii), which incorporates 42 U.S.C. § 1320a-7a, then provides for appeals

---

[10]   For what it is worth, the statutory (as opposed to regulatory) authority for this two-step exhaustion process is, at best, unclear.

of CMP Decisions directly to the Court of Appeals, so there is no opportunity for review of the Secretary's factual allegations by a jury in District Court.

Petitioner, and many others, long have grumbled about the inherent unfairness (and dubious constitutional basis) of the government seizing and holding money *before* any judicial or even quasi-judicial review; ALJs rubber-stamping CMS results, often, as here, on dubious rationales; and then, as here, the Secretary's Appeals Board sitting on an appeal for many years, while the Secretary continues to hold the petitioner's money. As noted above in note 9, the Appeals Board's "de novo" review standard that effectively renders administrative hearings meaningless just adds to the frustration.

Until the Supreme Court decided *SEC v. Jarkesy,* 603 U.S. 109 (2024), there was not much an unhappy petitioner could do about this unfair situation. *Jarkesy* changes the analysis; and as soon as the Court decided *Jarkesy*, Petitioner immediately filed a Motion to the Board to remand this matter to CMS, in order that Petitioner could request a jury trial conducted under the Federal Rules of Evidence to determine the material facts, which, in this case, fairly obviously included exactly what happened, and whether the Center's actions were consistent with CMS, CDC and State laws and guidance. These would seem to be exactly the sorts of factual issues appropriate for jury determination. In its Decision, the Board essentially said

that it need not follow *Jarkesy* until a court specifically orders it to do so.  That time is now.

The central issue in *Jarkesy*, as reflected here, was fairly narrow; that is, may an agency impose a CMP that the agency itself describes as "remedial" or "designed to punish or deter"– which is how CMS describes its CMPs – without offering the regulated party any opportunity to have a jury determine the material facts.   In *Jarkesy* the Supreme Court held that there is a fundamental constitutional flaw in statutory and regulatory schemes that allow only administrative review in such cases. The Court held that where, as here, an agency imposes a "punitive" or "remedial" CMP for regulatory noncompliance, such a CMP is equivalent to a common law remedy, and thus the Seventh Amendment requires that a jury, not an ALJ, must consider a challenge to that remedy in the first instance.  According to the Court, ALJ-only review of a CMP in such cases lacks four fundamental elements required by the Seventh Amendment: (1) the proceeding must be presided over by an independent Article III judge; (2) the jury must find facts; (3) the litigation must be subject to the Federal Rules of Evidence; and (4) discovery must be available by right. All of these elements are lacking in Appeals Board ALJ proceedings.

*Jarkesy* involved a proceeding by the Securities and Exchange Commission, but the Court made clear that its holding extends to all agencies that impose punitive

or remedial CMPs. According to the Court, such CMPs are "prototypical" common law remedies "that could only be enforced in courts of law." The Court noted that statutory and regulatory criteria that determine the size of the CMP according to factors such as seriousness of the violation, culpability, and the like – exactly the criteria set forth in CMS' CMP regulations at 42 C.F.R. §§ 488.404 and 488.438(f) – underscore that the remedy is "legal" in nature. The Court made clear that it is the nature of the *remedy* – that is, the CMP itself – that determines the constitutional requirement for jury review, and not, for instance, whether Congress created the remedy as part of a comprehensive regulatory program. According to the Court, "Congress cannot conjure away the Seventh Amendment by mandating that traditional legal claims be taken to an administrative tribunal."

In *Jarkesy,* the Court noted that it and other courts have created limited exceptions to the jury trial requirement with respect to "equitable" remedies such as returning funds to an injured party; and in limited areas involving certain traditional sovereign prerogatives that historically were not subject to jury review, such as cases involving admiralty, collecting revenues, foreign commerce, tariffs, relations with Indian tribes, and issuing patents. So far as Petitioner can tell, this Court has not addressed how far this "public rights" exception to the Seventh Amendment extends, and the few decisions from other courts that focus on whether the *underlying* right in

question (as opposed to the remedy) is "public" or "private," are, at best, murky. For instance, in *Axalta Coating Systems, Inc. v. Federal Aviation Administration,* 144 F.4th 467 (3ᵈ Cir. 2025), the Third Circuit held that a CMP for violation of a technical FAA freight packaging requirement was not the sort of traditional common law remedy that warranted a jury trial. But only a few months later, in *Sun Valley Orchards, LLC v. Department of Labor,* ___ F.4th ___, 2025 WL 2112927 (3ᵈ Cir. April 10, 2025), the same court found that a CMP for violation of an agricultural worker housing contract required by a Labor Department regulation did implicate the sort of common law rights that necessitated a jury trial. According to the Court, the admixture of contract and regulatory obligations weighed toward the "private" vs. "public" rights end of the spectrum. The suggestion is that this determination requires analysis of *both* the nature of the underlying right or obligation as well as the "common law" nature of the remedy.

Petitioner recognizes that this case may seem on first blush to fall somewhere between these cases. Some aspects of Medicare regulation, for instance, provider reimbursement contract provisions, implicate traditional contract rights. And, Petitioner suggests, some regulatory provisions – including, specific to this case, infection control obligations, specifically tuberculosis control obligations -- fairly obviously *do* incorporate traditional common law obligations.

As noted, CMS itself characterizes CMPs for violations of such traditional common law obligations as "remedial," exactly the language the Supreme Court used to assign such CMPs to the "traditional common law remedy" bucket. In that sense, the airfreight packaging obligation at issue in *Axalta* plainly is distinguishable, as it is hard even to describe a common law source for either the underlying obligation itself or the remedy for its violation, as both are *solely* products of a technical regulatory regimen. The handful of District Court decisions in this Circuit seem to focus on that criterion. For instance, in *Fagan v. DHHS*, Civ. No. TJS-23-2095, 2025 WL 1837402 (D. Md. July 2, 2025), the court found that a penalty imposed in a Provider Relief Fund recoupment action was in the nature of a fee created by the benefit program itself rather than "legal damages," and so *Jarkesy* was not applicable.

The Secretary's Appeals Board traditionally says that it lacks the authority to declare a regulation unconstitutional. That may be true, but it certainly can interpret its appeal regulations in light of the Supreme Court's description of constitutional requirements. *Jarkesy* requires that a party challenging a CMP that implicates common law rights and remedies has the right to elect a jury trial, at least to find facts. In this case, Petitioner almost certainly would have elected such a trial had that course been available.

That conclusion has a corollary. As noted, *nine years later* CMS continues to hold the nearly $1.5 million it "escrowed" pending the administrative appeal.

42 U.S.C. § 1395i-3(h)(2)(b)(ii)(IV) and 42 C.F.R. § 488.431(b) purport to authorize CMS to "escrow" CMPs pending appeals under Part 498. *But CMS' own Official Comment to the regulation* recognizes that there are constitutional limits against seizing and holding money without due process, including some kind of *pre-seizure* hearing. 76 Fed. Reg. 15106 (Mar. 18, 2013). That concession was based upon a 1993 Supreme Court Decision that specifically held that the government may seize money or property prior to a hearing in non-criminal cases only in "extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event." *United States v. James Daniel Good Real Property,* 510 U.S. 43 (1993). CMS has never argued that routine appeals of its enforcement actions pose any such "extraordinary situation;" thus, if, as *Jarkesy* holds, the due process necessary in a CMP appeal is a jury trial, then CMS should have held off seizing – or should have returned – the "escrowed" funds pending such review.

## B. <u>CMS Is Not Authorized To Impose Sanctions On An "Ad Hoc" Basis</u>

The crux of the legal argument Petitioner made below is that CMS expressly directed nursing facilities to refer to State regulations and CDC guidance for the

logical nuts and bolts of implementing then-Section 483.65. Petitioner argued that it should have been straightforward for CMS, the ALJ, and the Appeals Board to harmonize the Center's TB Policy with these specific provisions, rather than doing legal and logical gymnastics to find that the Center's Policy creates some kind of new *implied* regulatory requirements.

CMS offered no evidence that the Center's staff plausibly was on notice that CMS might cite a violation and impose a sanction on the basis of such *implied* regulatory requirements (much less that the Center's staff was on notice that it should interpret and apply its own TB Policy in some novel and non-obvious way); for instance, CMS identified no directive, precedent, guidance, etc., to that effect. A series of courts specifically has held in recent years that an agency's imposition of sanctions on the basis of such "ad hoc" regulatory interpretation is "arbitrary and capricious" under the Administrative Procedure Act.

Notably, the very week the ALJ rendered his Decision, the Sixth Circuit issued a Decision reversing *the same ALJ's* Decision in a comparable case, on exactly that basis. In *Golden Living Center – Mountain View v. Secretary of Health and Human Services,* 832 F. Appx 967 (6th Cir. 2020), that Court applied the principles the Supreme Court recently had set forth in *Kisor v. Wilkie,* 588 U.S. 232 (2019), to reverse DAB Decision No. 2953 (2019). In *Kisor* the Supreme Court held that the

APA gives agencies considerable leeway to interpret and apply their regulations *prospectively,* but not to impose sanctions without providing reasonably specific *prior* notice of the basis for the action. In *Golden Living*, the ALJ had reviewed a nursing facility's response to an unusual series of resident falls in its Alzheimer's Unit; found that the facility had done everything CMS' applicable regulation and Interpretive Guideline had described to prevent falls; but the ALJ nevertheless upheld a sanction because, he said, the facility had not *also* considered increasing staff on the Unit, even though CMS had offered no evidence that any regulation, Interpretive Guideline, standard of care, study, or anything else, recommended that response to an increase in falls; that is, put the facility on notice that CMS might impose sanctions on that basis.

Notably, in *Golden Living*, the Court specifically held that that the APA does not permit CMS, an ALJ, or the Appeals Board to *extrapolate* "ad hoc" regulatory obligations from general regulatory language without providing prior notice. That is precisely what CMS, the same ALJ, and the Appeals Board did here as well.[11]

---

[11] The *Golden Living* analysis and result is consistent with other appellate decisions applying APA principles in nursing facility appeals. In *Elgin Nursing and Rehabilitation Center v. DHHS,* 718 F.3d 488, 493 (5th Cir. 2013), the Fifth Circuit held that CMS may not base sanctions on what the Court called ad hoc "second and third level" "interpretations of its interpretations," since imposition of sanctions based on that basis "would allow agencies to punish 'wrongdoers' without first giving fair notice of the wrong to be avoided." In *Plott Nursing*

In this case, CMS instructed facilities in its Interpretive Guideline to then-Section 483.65 to refer to state law and CDC guidance when establishing and implementing their infection control policies and procedures.  There was no dispute that state law and CDC guidance actually established – and put the Center on notice of – specific TB control procedures, including specific assignment of certain functions to the local public health agency, and *not* to the facility or its Medical Director or staff.  Petitioner's witnesses testified that they understood these provisions, and the Center's TB Policy, in exactly such terms.  The Center's staff, Genesis' Dr. Loome, *and even representatives of the County Health Department,* all testified that they understood State law to require the County Health Department to direct the timing of prophylaxis, and to provide specific resident-by-resident chart review, direction, and specific medication orders in that regard.  There is no dispute that all concerned proceeded on that basis through 2015 into 2016.  *No one* testified

_____

*Home v. DHHS,* 779 F.3d 975, 984 (9th Cir. 2015), a facility had implemented a care plan to prevent and address a resident's recurrent urinary tract infections that included all the interventions suggested in a CMS Interpretive Guideline, and so the Court set aside a citation based on additional ad hoc surveyor suggestions. Similar analyses and results are illustrated in *Cal Turner Extended Care Pavilion v. DHHS,* 501 F. Appx 502 (6th Cir. 2012) and *Emerald Shores Health Care Associates, LLC v. DHHS,* 545 F.3d 1292 (11th Cir. 2008).

that *anyone* understood the Center's TB Policy, including the reference to "prompt" action, to override or supplant these provisions.

The only way the ALJ and Board could get around this evidence is by creating *implied*, "ad hoc" obligations that CMS itself never stated. This case is governed by *Kisor*, and, as a practical matter, is on all fours with *Golden Living*.

## C.     The Appeals Board's Decision Is Not Supported By The Record

The ultimate standard of review the Secretary's findings of fact (*i.e.*, the Board Decision) in CMP appeals is whether those findings are supported by "substantial evidence in the record, *considered as a whole.*" 42 U.S.C. §1320a-7a(e) (emphasis added).[12]  The Court reviews legal determinations – that is, the application of the regulations to the facts – de novo.

As outlined above, neither then-Section 483.65 nor CMS' "Interpretive Guideline" to the regulation says anything about TB investigations or responses. At

---

[12]  As the Seventh Circuit has described this standard, "there is a notable difference between 'substantial evidence' and 'substantial evidence in the record as a whole.' 'Substantial evidence is merely such 'relevant evidence that a reasonable mind might accept as adequate to support a conclusion.' 'Substantial evidence in the record as a whole,' however, requires a more scrutinizing analysis. In the review of an administrative decision, 'the substantiality of evidence must take into account whatever in the record fairly detracts from its weight.' Thus the court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence that is contradictory." *Gavin v. Heckler*, 811 F.2d 1195, 1199 (7th Cir. 1987) (citations omitted).

the same time, it is obvious that *someone* must take the lead to initiate and direct TB-control functions at nursing facilities, including identifying who needs prophylaxis, when, and which medications to use. As a practical matter, the Board's inference of some "implied" regulatory duties in this regard, whether extrapolated from the Center's TB Policy or otherwise, not only disregards the specific division of authority and responsibilities set forth in Maryland law, CDC Guidelines, and the Center's TB Policy, but it also makes no legal or logical sense.

There was no dispute in this case that Dr. Qasba, the County Health Department's Medical Director, agreed to review resident records, and to provide specific resident-by-resident prophylaxis orders, for a very good reason. Identification and control of TB has been a public health responsibility in this country for 200 years, and Dr. Qasba – and not the Center's staff – had the pertinent expertise to do so. No one disputes that private parties – even regulated private parties such as nursing facilities – have neither the resources nor the authority to compel third parties to submit to TB testing, much less, as in Maryland, to compel treatment. Likewise, no one disputes that it is the County Health Department's TB control specialists, and not nursing facility physicians and nurses, who are the experts in the field. Dividing or blurring these responsibilities – by "implication" at that – is a recipe for chaos; and while the analogy is not perfect, consider the chaos caused by

unclear lines of responsibility to identify, segregate, and treat the first victims of COVID-19. It makes even less sense to create some kind of "implied" division of responsibility where, as here, the State and the CDC clearly have stated the rationale for assigning to the local public health the authority to identify, test and order treatment for potentially infected individuals.

CMS' strongest argument in this case might have been that at some (unspecified) point, the Center's staff should have realized that the County's staff were failing their obligations, and then . . . done what? Complained to the Governor? Taken public health responsibilities upon themselves? Just posing the question illustrates the awkwardness of extrapolating some new *regulatory* obligation from the terms of the regulation or the Center's TB Policy. The ALJ actually agreed that it was not until the Summer of *2016 – a full year after most of the material events* – that the County Health Department – *that is, the experts in TB control* – expressed any concern, much less urgency, regarding *any* aspect of the case, including prophylaxis. It is not clear why the Center's Nurse Hayden or anyone else at the Center – who were *not* experts in TB control – should have been expected to take it on themselves to second-guess the County Health Department's activities or lack thereof; much less exactly when that purported duty arose. Indeed, Nurse Hayden specifically testified

that she never considered doing so *because* Nurse Fontana consistently was promising to follow up.  Tr. 1067, J.A. 158.

Perhaps CMS never contemplated a scenario where a local public health agency would fail its own responsibilities, as that scenario was not addressed in any CMS regulation or guidance at the time.  But while the County Health Department may not be "on trial," it seems impossible to evaluate the *practical aspects of* the Center's compliance with then-Section 483.65 without considering the Center's actions – including reliance on the County Health Department – in terms of the County Health Department's TB control responsibilities, and the undisputed evidence regarding the instructions, representations, and actions by the County Health Department over a period of several months in 2015.

## Conclusion

For the reasons set forth above, Petitioner urges the Court to set aside the Secretary's findings and conclusions, and CMS' sanctions, as arbitrary and capricious and not in accordance with controlling law.

Respectfully submitted,

/s/_____
Joseph L. Bianculli
HEALTH CARE LAWYERS, PLC
5990 Deale Beach Road
Deale, MD 20751

(703) 841-9330
Bianculli@healthcarelawyers.com

Counsel to Petitioner

## REQUEST FOR ORAL ARGUMENT

Petitioner believes that oral argument would help illuminate the issues for the Court, and accordingly so requests.

## STATEMENT OF RELATED CASES

*Oak Ridge Center v. DHHS,* No. 25-2921, now in abeyance, raises the *Jarkesy* issue in a comparable nursing facility appeal.

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)(7)(b)

Undersigned counsel certifies that the foregoing Petitioner's Brief has been printed in 14 point Times New Roman typeface, and, according to the word processor's word count, contains 10,899 words (not including Rule 32(a)(7) exclusions).

/s/Joseph L. Bianculli
Joseph L. Bianculli