No. 25-1669

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

————————————

SLIGO CREEK CENTER,

Petitioner,

v.

UNITED STATES DEPARTMENT OF HEALTH & HUMAN SERVICES;
ROBERT F. KENNEDY, JR., Secretary of the U.S. Department of Health &
Human Services,

Respondents.

————————————

On Petition for Review from a Final Order of the
Department of Health and Human Services

————————————

## BRIEF FOR RESPONDENTS

————————————

BRETT A. SHUMATE
  *Assistant Attorney General*

MICHAEL S. RAAB
DANIEL AGUILAR
DAVID L. PETERS
  *Attorneys, Appellate Staff*
  *Civil Division*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 598-6735*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................... 1

STATEMENT OF JURISDICTION ............................................. 2

STATEMENT OF THE ISSUES ................................................. 3

PERTINENT STATUTES AND REGULATIONS ........................... 3

STATEMENT OF THE CASE ................................................... 3

    A.    Statutory Background .................................................. 3

    B.    Regulatory Background .............................................. 8

    C.    Factual Background & Prior Proceedings ................... 10

SUMMARY OF ARGUMENT ................................................... 20

STANDARD OF REVIEW ...................................................... 24

ARGUMENT ....................................................................... 24

I.    Congress Constitutionally Authorized The Secretary To Adjudicate Violations Of The Reform Act. ...................................... 24

    A.    Congress may assign adjudication of public rights to the Executive consistent with the Seventh Amendment. ............... 25

    B.    Petitioner's violation of the Reform Act implicates public rights, not private rights. .................................................. 28

    C.    Petitioner's and amicus's Seventh Amendment arguments are unavailing. .................................................. 38

II.    Petitioner's Remaining Claims Are Without Merit. ........................... 45

CONCLUSION .................................................................... 48

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                      **Page(s)**

*Almy v. Sebelius,*
  679 F.3d 297 (4th Cir. 2012) ....................................................... 37

*Austin v. Shalala,*
  994 F.2d 1170 (5th Cir. 1993) ..................................................... 33

*Boehringer Ingelheim Pharms., Inc. v. U.S. Dep't*
  *of Health & Hum. Servs.,*
  150 F.4th 76 (2d Cir. 2025) ......................................................... 37

*Cathedral Rock of N. Coll. Hill, Inc. v. Shalala,*
  223 F.3d 354 (6th Cir. 2000) ....................................................... 44

*City of Arlington v. FCC,*
  569 U.S. 290 (2013) ..................................................................... 27

*Crowell v. Benson,*
  285 U.S. 22 & n.13 (1932) ....................................... 21, 27, 29, 30, 39, 40, 42

*Doolin Sec. Sav. Bank, F.S.B. v. FDIC,*
  53 F.3d 1395 (4th Cir. 1995) ....................................................... 44

*Ex parte Bakelite Corp.,*
  279 U.S. 438 (1929) ............................................................... 29, 36

*Golden Living Center—Mountain View v. Secretary*
*of Health & Human Services,*
  832 F. App'x 967 (6th Cir. 2020) .............................................. 47

*Granfinanciera, S.A., v. Nordberg,*
  492 U.S. 33 (1989) ................................................... 25, 26, 28, 37

*Health & Hosp. Corp. of Marion Cnty. v. Talevski,*
  599 U.S. 166 (2023) ............................................... 4, 5, 33, 35, 40

*Houston v. St. Louis Indep. Packing Co.,*
  249 U.S. 479 (1919) ................................................................. 40

*Lancaster Hosp. Corp. v. Becerra,*
  58 F.4th 124 (4th Cir. 2023) ...................................................... 43

*Liberty Commons Nursing & Rehab Center—Johnston v. Leavitt,*
  241 F. App'x 76 (4th Cir. 2007) (per curiam) ........................... 44

*Memorial Hosp. v. Heckler,*
  706 F.2d 1130 (11th Cir. 1983) ................................................. 43

*Minnesota Ass'n of Health Care Facilities, Inc. v.*
  *Minnesota Dep't of Pub. Welfare,*
  742 F.2d 442 (8th Cir. 1984) ..................................................... 37

*Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC,*
  584 U.S. 325 (2018) ................................................. 26, 27, 38-39

*Oceanic Steam Navigation Co. v. Stranahan,*
  214 U.S. 320 (1909) ................................................................. 36

*Putnam Ctr. v. U.S. Dep't of Health & Hum. Servs.,*
  770 F. App'x 630 (4th Cir. 2019) .............................................. 24

*Sasser v. Administrator, U.S. EPA,*
  990 F.2d 127 (4th Cir. 1993) ..................................................... 26

*SEC v. Jarkesy,*
  603 U.S. 109 (2024) ...... 2, 22, 23, 25, 26, 27, 28, 35, 36, 37, 38, 40, 42, 44

*Shalala v. Illinois Council on Long Term Care, Inc.,*
  529 U.S. 1 (2000) ...................................................................... 4

*Snyder v. Phelps,*
  580 F.3d 206 (4th Cir. 2009) ..................................................... 45

*Spokeo, Inc. v. Robins,*
  578 U.S. 330 (2016) .................................................................. 42

*Stern v. Marshall,*
  564 U.S. 462 (2011) .............................................................. 26, 32

*Thomas v. Union Carbide Agric. Prods. Co.,*
  473 U.S. 568 (1985) ...................................... 2, 22, 31, 32, 37, 38, 39, 40, 41

*United States v. Erika, Inc.,*
  456 U.S. 201 (1982) ................................................................. 32

*United States v. Teller*,
  107 U.S. 64 (1883) ................................................................. 30

**Constiution:**

U.S. Const. amend. VII .............................................................. 25

**Statutes:**

5 U.S.C. § 706(2)(A) ................................................................. 24

42 U.S.C. 1396 ......................................................................... 4

42 U.S.C. § 1320a-7a(c)(2) ......................................................... 7

42 U.S.C. § 1320a-7a(e) ......................................................... 3, 7-8

42 U.S.C. § 1395i-3(b) ............................................................... 5

42 U.S.C. § 1395i-3(b)(1)(A) ................................................. 5, 34, 43

42 U.S.C. § 1395i-3(d) ............................................................... 5

42 U.S.C. § 1395i-3(d)(3)(A) ................................................. 1, 5, 35

42 U.S.C. § 1395i-3(d)(4)(B) ....................................................... 8

42 U.S.C. § 1395i-3(f)(1) ....................................................... 8, 33

42 U.S.C. § 1395i-3(g)(1)(A) ....................................................... 6

42 U.S.C. § 1395i-3(g)(2) .......................................................... 6

42 U.S.C. § 1395i-3(g)(3) ....................................................... 6

42 U.S.C. § 1395i-3(g)(4) ....................................................... 6

42 U.S.C. § 1395i-3(h) ........................................................... 6

42 U.S.C. § 1395i-3(h)(1) ....................................................... 6

42 U.S.C. § 1395i-3(h)(2)(A)(i) ............................................. 6

42 U.S.C. § 1395i-3(h)(2)(B) ................................................. 7

42 U.S.C. § 1395i-3(h)(2)(B)(i) ......................................... 7, 36

42 U.S.C. § 1395i-3(h)(2)(B)(ii) ........................ 3, 7, 8, 25, 36

42 U.S.C. § 1395i-3(h)(2)(B)(iii) ..................................... 7, 36

Act of Feb. 12, 1794, ch. 2, 6 Stat. 13 ............................... 30

Act of Mar. 18, 1818, ch. 19, 3 Stat. 410 ........................... 30

Act of Sep. 29, 1789, ch. 24, 1 Stat. 95 .............................. 29

Federal Nursing Home Reform Act (Reform Act),
  Pub. L. No. 100-203, tit. IV, subtitle C,
  101 Stat. 1330, 1330-160-1330-221 (1987) ..................... 4

Title XVIII of the Social Security Act,
  42 U.S.C. § 1395 *et seq.*................................................. 3

Title XIX of the Social Security Act,
  42 U.S.C. 1396 *et seq.* ................................................. 4

**Legislative Material:**

Annals of Cong. 10001-02 (1794) .................................... 31

H.R. Rep. No. 100-391, pt. 1 (1987)...................... 5, 7, 34, 35

**Regulations:**

42 C.F.R. § 483.1, subpart B ........................................................ 8

42 C.F.R. § 483.65 (2016) ................................. 9, 18, 19, 35, 41, 43

42 C.F.R. § 483.65(a)(1) (2016) ..................................................... 9

42 C.F.R. § 483.65(a)(3) (2016) ..................................................... 9

42 C.F.R. § 488, subpart F ............................................................ 8

42 C.F.R. § 488.406(a)(3) ............................................................. 9

42 C.F.R. § 488.431 ................................................... 9, 10, 11

42 C.F.R. § 488.431(a)...............................................................10

42 C.F.R. § 488.431(b)(3)...........................................................10

42 C.F.R. § 488.431(d)(2)...........................................................10

42 C.F.R. § 488.438 ................................................................. 19

42 C.F.R. § 488.438(a)(1)(i).........................................................19

42 C.F.R. § 488.438(d)(2)............................................................19

42 C.F.R. § 488.705 ................................................................. 16

Md. Code Regs. § 10.06.01.21 (2016) ......................................... 12

Md. Code Regs. § 10.06.01.21(B)(1) (2016) ................................ 13

Md. Code Regs. § 10.06.01.21(B)(2) (2016) ................................ 13

Md. Code Regs. § 10.07.02.09 (2016) .........................................12

Md. Code Regs. § 10.07.02.09(A)(15) (2016).................................12

Md. Code Regs. § 10.07.02.09(A)(16) (2016)................................12

Md. Code Regs. § 10.07.02.11 (2016)...........................................12

Md. Code Regs. § 10.07.02.11-1(A)(1) (2016) ..............................13

Md. Code Regs. § 10.07.02.11-1(G)(3) (2016) ..............................13

Md. Code Regs. § 10.07.02.21 (2016) .....................................12, 13

Md. Code Regs. § 10.07.02.21-2(B)(1) (2016) ..............................13

Md. Code Regs. § 10.07.02.21-2(B)(5) (2016)...............................13

**Other:**

4 William Blackstone, *Commentaries on the Laws of England* (1769)...... 42

76 Fed. Reg. 15,106 (Mar. 18, 2011) ........................................... 10

81 Fed. Reg. 68,688 (Oct. 4, 2016) ............................................. 9

Centers for Disease Control and Prevention, *Controlling Tuberculosis in the United States* 58 (Nov. 4, 2005)...........................................12

John Green, *Everything Is Tuberculosis* (2025).........................................11

Harold J. Krent, *Presidential Control of Adjudication Within the Executive Branch*, 65 Case W. Res. L. Rev. 1083 (2015) ....................................29, 30

Jerry L. Mashaw, *Recovering American Administrative Law: Federalist Foundations, 1787-1801*, 115 Yale L.J. 1256, 1298 (2006) ...................30, 31

## INTRODUCTION

Congress enacted the Federal Nursing Home Reform Act (Reform Act) to ensure that nursing homes that participate in the Medicare and Medicaid programs provide adequate treatment to the Nation's elderly. Among other things, Congress required these facilities to "establish and maintain an infection control program" to provide a safe environment for resident beneficiaries and to prevent the transmission of infectious disease. 42 U.S.C. § 1395i-3(d)(3)(A).

This case arises from an outbreak of tuberculosis at a nursing home operated by petitioner that participates in Medicare. The Secretary of Health and Human Services brought an administrative enforcement action on the ground that petitioner violated the Reform Act by failing to adhere to its own infection control program in responding to the outbreak, which jeopardized the health of petitioner's residents. Petitioner challenges the enforcement action, arguing that it violated petitioner's Seventh Amendment right to a jury trial and that the determination of noncompliance was arbitrary and capricious.

The petition should be denied. Petitioner was on notice of its Reform Act obligations, and the record demonstrates that petitioner failed to meet those obligations by not ensuring that its residents received adequate

treatment. Under longstanding precedent, moreover, Congress may direct the Executive Branch to adjudicate whether the recipient of federal funds under a public-benefits scheme has violated the terms of that scheme. Thus, decisions concerning "Medicare reimbursements" are "routinely decided by agency action with limited … review by Article III courts." *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 583 (1985). Congress may likewise direct the Executive to expel participants from the Medicare program for violating its requirements, or to impose appropriate money penalties, without first invoking the authority of an Article III court or a jury. *SEC v. Jarkesy*, 603 U.S. 109, 129 (2024) (for matters of public rights, Congress may "enforce those prohibitions with administrative penalties assessed without a jury").

## STATEMENT OF JURISDICTION

The Department of Health and Human Services Departmental Appeals Board issued its final decision finding petitioner violated the Reform Act on May 23, 2025. JA61 (AR000061).[1] Petitioner filed a timely petition for review in this Court on June 12, 2025. Pet. for Review (June 12,

---

[1] "JA___" citations refer to the parties' joint appendix, and "AR___" citations refer to the parallel citations in the administrative record.

2025).  This Court has jurisdiction under 42 U.S.C. § 1395i-3(h)(2)(B)(ii), which incorporates 42 U.S.C. § 1320a-7a(e).

## STATEMENT OF THE ISSUES

Petitioner challenges the determination that it violated the Reform Act by failing to maintain an infection control program in the face of a tuberculosis outbreak.  The questions presented are:

1.     Whether Congress constitutionally authorized the Executive Branch to adjudicate violations of the Reform Act and to impose money penalties.

2.     Whether petitioner was on notice of its obligations under the Reform Act.

3.     Whether the noncompliance determination was supported by substantial evidence.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A.     Statutory Background

**1.**     Enacted in 1965 as Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.*, Medicare is a federally funded program that pays healthcare providers for services rendered to individuals who are age 65 or

older or who are disabled. The Medicaid program, enacted as Title XIX of the Social Security Act, 42 U.S.C. 1396 *et seq*., provides federal financial assistance to States to help them pay providers for health care for low-income individuals. Both programs are administered by the Secretary of Health and Human Services (Secretary), acting through the Centers for Medicare & Medicaid Services (CMS). Medicare and Medicaid beneficiaries receive care at a variety of medical facilities, including at nursing homes. Nursing homes that participate in the programs must "enter into a provider agreement with the Secretary" and "comply with numerous statutory and regulatory requirements" to "receive payment." *Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1, 6 (2000).

In the Federal Nursing Home Reform Act (Reform Act), Pub. L. No. 100-203, tit. IV, subtitle C, 101 Stat. 1330, 1330-160-1330-221 (1987), Congress "tightened the substantive standards that Medicare (and Medicaid) imposed upon nursing homes" and "significantly broadened the Secretary's authority to impose remedies upon violators," *Illinois Council*, 529 U.S. at 6. Congress sought to address concerns "about the poor condition of such facilities," *Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 181 (2023), based on a "broad consensus" that the then-existing regulations "allow[ed] too many marginal or substandard

nursing homes to continue i[n] operation," causing people to "receive very inadequate—sometimes shockingly deficient—care that [was] likely to hasten the deterioration of their physical, mental, and emotional health," H.R. Rep. No. 100-391, pt. 1, at 452 (1987) (quotation marks omitted). In enacting the Reform Act, Congress revised the regulatory scheme "to improve the quality of care" at facilities that receive payment under Medicare and Medicaid, and to "bring substandard facilities into compliance" with "quality of care requirements." *Id.* The current scheme reflects the "longstanding national commitment to provide safe and dignified care for the elderly." *Talevski*, 599 U.S. at 180-81.

The Reform Act requires nursing homes to provide care for their "residents in such a manner and in such an environment as will promote maintenance or enhancement of the quality of life of each resident." 42 U.S.C. § 1395i-3(b)(1)(A). The statute accordingly sets forth requirements related to the provision of services and activities, the protection of residents' rights, and facility maintenance. *See id.* § 1395i-3(b)-(d). As relevant here, nursing homes must "establish and maintain an infection control program designed to provide a safe, sanitary, and comfortable environment in which residents reside and to help prevent the development and transmission of disease and infection." *Id.* § 1395i-3(d)(3)(A).

**2.**     Congress also specified how to monitor a Medicare recipient's compliance with these requirements. The Secretary works cooperatively through agreements with States to ensure that "each State shall be responsible for certifying … the compliance of … facilities (other than facilities of the State) with the [Reform Act's] requirements." 42 U.S.C. § 1395i-3(g)(1)(A). State agencies inspect nursing homes at least yearly to ensure that they meet all statutory requirements. *Id*. § 1395i-3(g)(2)-(3). State agencies also investigate complaints of statutory violations and monitor compliance with the Reform Act's requirements. *Id*. § 1395i-3(g)(4).

Congress further authorized the Secretary, working with the States, to enforce the Reform Act's requirements. *See* 42 U.S.C. § 1395i-3(h). States can ask the Secretary to take remedial action when they find that a nursing home has committed a statutory violation. *Id*. § 1395i-3(h)(1). If the Secretary likewise determines that there has been a violation that "immediately jeopardize[s] the health or safety of [the facility's] residents, the Secretary shall take immediate action to remove the jeopardy," which may include "terminat[ing] the facility's participation" in Medicare. *Id*. § 1395i-3(h)(2)(A)(i).

Congress also chose to provide "a set of intermediate sanctions" short of termination.  H.R. Rep. No. 100-391, pt. 1, at 452; *see* 42 U.S.C. § 1395i-3(h)(2)(B).  These options allow the Secretary to address violations while avoiding the "difficulty and undesirability of relocating residents" from a nursing home that has been expelled from Medicare.  H.R. Rep. No. 100-391, pt. 1, at 452.  Thus, the Secretary may "deny any further payments" until the facility brings itself into compliance, and may "appoint temporary management to oversee" the facility until it can either be "orderly clos[ed]" or until "improvements are made" to satisfy "all the requirements" identified.  42 U.S.C. § 1395i-3(h)(2)(B)(i), (iii).

As relevant here, the Secretary also may impose money penalties through an enforcement action.  42 U.S.C. § 1395i-3(h)(2)(B)(ii).  In such an action, the facility has "the opportunity to participate in an independent informal dispute resolution process."  *Id*. § 1395i-3(h)(2)(B)(ii)(IV)(aa).  If that does not resolve the issue, the Secretary may collect and keep the penalty amount in an escrow account "pending the resolution of any subsequent appeals."  *Id*. § 1395i-3(h)(2)(B)(ii)(IV)(dd).  The facility is entitled to an adversarial hearing, *id*. § 1320a-7a(c)(2), and, if "adversely affected by a determination of the Secretary[,] ... may obtain a review of such determination in the United States Court of Appeals," *id*. § 1320a-

7a(e).  A facility that "successfully appeals the penalty" is entitled to recovery of any penalty amount held in escrow "plus interest."  *Id.* § 1395i-3(h)(2)(B)(ii)(IV)(ee).

### B.    Regulatory Background

In addition to adopting a broad array of requirements that apply to nursing homes, Congress in the Reform Act also directed the Secretary to ensure that program requirements are "adequate to protect the health, safety, welfare, and rights of residents and to promote the effective and efficient use of public moneys."  42 U.S.C. § 1395i-3(f)(1).  Congress further authorized the Secretary to impose "such other requirements relating to the health, safety, and well-being of residents … as the Secretary may find necessary."  *Id.* § 1395i-3(d)(4)(B).  Pursuant to that authority, the Secretary, acting through CMS, has issued numerous regulations that set out the requirements that nursing homes must meet to participate in the Medicare program and that detail the process for ensuring that facilities maintain compliance with participation requirements, *see* 42 C.F.R. § 483.1, subpart B ("Requirements for Long Term Care Facilities"); *id.* § 488, subpart F ("Enforcement of Compliance for Long-Term Care Facilities with Deficiencies").

As relevant here, CMS's implementing regulations flesh out the statutory requirement that facilities must establish and maintain an infection control program. At the time relevant to this litigation,[2] CMS's regulations provided that a nursing home must "establish and maintain an infection control program designed to provide a safe, sanitary, and comfortable environment and to help prevent the development and transmission of disease and infection." 42 C.F.R. § 483.65 (2016). Facilities were required to "[i]nvestigate[], control[], and prevent[] infections in the facility" and to "[m]aintain[] a record of incidents and corrective actions related to infections." *Id*. § 483.65(a)(1), (3). Facilities that failed to meet these requirements could face money penalties and other enforcement measures. *See id*. § 488.406(a)(3).

The Secretary also established detailed processes for the imposition and collection of money penalties, including the opportunity for independent informal review and the placement in an escrow account. *See* 42 C.F.R. § 488.431. The Secretary explained that Congress provided for these mechanisms to "creat[e] financial incentives for facilities to maintain

---

[2] The regulatory requirements related to infection control programs were substantially revised effective November 28, 2016. *See* 81 Fed. Reg. 68,688 (Oct. 4, 2016). The parties below agreed that it was appropriate to apply the regulations in effect as of October 2016 to the events at issue here. *See* JA62 (AR000062).

compliance and promptly correct any noncompliance" and to address "[c]oncerns about the delays in payment." 76 Fed. Reg. 15,106, 15,107 (Mar. 18, 2011). CMS's implementing regulations thus provide that prior to the collection of a money penalty nursing homes have "an opportunity for independent informal dispute resolution," which must "[b]e completed within 60 days of [the] facility's request," must "[g]enerate a written report," and must be conducted by an "independent entity" or a "State agency" that is "separate from the State survey agency." 42 C.F.R. § 488.431(a). The regulations further provide that upon completion of the independent review process (or upon expiration of 90 days if a facility opts to forego that process), the Secretary "may collect and place" the imposed penalty in an escrow account during the pendency of any subsequent administrative appeals. *Id.* § 488.431(b)(3). If a facility ultimately prevails on appeal, the escrowed amounts "will be returned to the facility with applicable interest." *Id.* § 488.431(d)(2).

### C.    Factual Background & Prior Proceedings

Petitioner is Sligo Creek Center, which operates a Maryland-based nursing home that participates in Medicare. *See* JA67 (AR000067). This case arises from an outbreak of tuberculosis (TB) at petitioner's facility in

2015 and 2016.  As petitioner acknowledges, Opening Br. 6, the material facts underlying this petition are not in dispute.

**1.**     Tuberculosis is an infectious disease that is caused by the bacterium *Mycobacterium tuberculosis* (*M. tuberculosis*).  The bacterium is spread by airborne droplets, and infection usually occurs within a few weeks after inhalation.  Importantly, there are two different kinds of infection—active and latent TB infections.  An active TB infection causes symptoms like fever and coughing, and is contagious.  It can take months of daily medication to successfully treat an active TB infection.  *See* John Green, *Everything Is Tuberculosis* 130 (2025).  Without treatment, TB is deadly—it killed 1.25 million people in 2023 alone.  *Id.* at 4.  Patients with untreated active TB will likely have their "lungs collapse or fill with fluid" making breathing impossible, or they can "suffer a sudden, uncontrollable hemorrhage, leading to a quick death as blood drowns the lungs."  *Id.* at 35-36.  Latent TB infections do not present symptoms and are not contagious; but the patient will test positive for TB and can have their latent infection progress into an active infection.

Because of these risks, latent TB infection can be appropriate for treatment, especially for individuals with risk factors that make progression to an active TB infection more likely.  That includes elderly residents of

nursing homes, who are "almost twice as likely to acquire TB" as elderly individuals not living in such facilities. JA65 (AR000065) (quoting Centers for Disease Control and Prevention, *Controlling Tuberculosis in the United States* 58 (Nov. 4, 2005) (2005 Guidance)).

**2.** In guidance published at the time relevant to this litigation, the Centers for Disease Control and Prevention (CDC) recommended that nursing-home residents with a latent TB infection "should be offered treatment" in the form of certain prophylactic drug regimens. JA65 (AR000065) (quoting 2005 Guidance 58) (explaining that the preferred treatment is nine months). CDC explained that "[c]ontrol of TB in nursing homes requires, among other things, prompt detection and diagnosis, isolation of those who are infectious, and initiating standard therapy." JA65 (AR000065). Treatment in this manner can "prevent future outbreaks" and "reduce the risk for death due to progression to active TB." JA65 (AR000065).

At the time relevant here, CDC's guidance was incorporated into Maryland's regulations establishing requirements for the treatment of TB in nursing homes. *See* JA66 (AR000066); *see also* Md. Code Regs. §§ 10.06.01.21, 10.07.02.09, 10.07.02.11, 10.07.02.21 (2016). The state regulations required nursing facilities to work in partnership with

Maryland Health Department officers to address TB infections.  *See* Md. Code Regs. § 10.06.01.21 (2016).  State officers were required to direct "testing for tuberculosis infection using a [CDC] approved method" and to "[r]ecommend appropriate treatment for latent tuberculosis infection."  *Id.* § 10.06.01.21(B)(1)-(2).  Nursing homes were responsible for the overall coordination and provision of medical services, *id.* §10.07.02.11-1(A)(1), (G)(3), including the development and implementation of policies to control TB infections, *id.* § 10.07.02.09(A)(15)-(16).  Specifically, nursing homes were required to "assess residents for tuberculosis" and to "manage a resident with a history of ... latent infection" in accordance with CDC guidance.  *Id.* § 10.07.02.21-2(B)(1), (5).

Consistent with both federal and state requirements, petitioner established an infection control policy with procedures specific to the management of TB infections.  *See* JA68 (AR000068); *see also* JA171-178 (AR002032-002039) (petitioner's policy).  Among other things, the policy provided that when a resident tested positive for a TB infection, petitioner must notify the state health department and follow its recommendations for investigation and follow up.  JA171 (AR002032).  The policy further provided that petitioner must obtain a medical evaluation to determine whether a TB infection was active.  JA174 (AR002035).  If the infection was

latent, the policy required petitioner to "continue medical evaluation for consideration of alternate diagnosis and/or evaluation for chemoprophylaxis"—i.e., a prophylactic drug treatment. JA174 (AR002035).

3.     During the spring of 2015, two of petitioner's employees and a former resident tested positive for active TB. State health officials met with petitioner's medical staff in May 2015 to coordinate a response to the potential exposure of petitioner's residents. State officials explained to petitioner's staff that it "was at high risk for TB transmission" and that "[p]etitioner's staff would be responsible for testing its residents for TB and for follow up treatment," including "prophylactic treatment to individuals with [latent TB infections]." JA69 (AR000069). State officials recommended that anyone that tested positive for a latent TB infection should "receive prophylactic treatment unless contraindicated." JA69 (AR000069).

In the ensuing weeks, petitioner took responsibility for testing its staff and residents for TB infections. Consistent with typical TB testing protocols, most testing involved a skin test that occurred across two

rounds.[3] JA70 (AR000070). After the initial round of testing, no residents were found to have active TB, but at least nineteen residents tested positive for latent TB infections. JA70 (AR000070). Petitioner and state officials agreed to delay providing treatment to those with latent TB infections until the second round of testing was completed. JA70 (AR000070). In August 2015, petitioner conducted the second round of testing on residents that tested negative for a TB infection in the earlier round of testing. Although no residents in the test group had active TB infections, six more tested positive for latent TB infections. JA70 (AR000070).

Following the second round of testing, petitioner's staff and state officials exchanged communications about potential follow up from the testing results. *See* JA70-71 (AR000070-000071). But apart from one resident prescribed prophylactic treatment for a latent TB infection by a separate treating physician in connection with a kidney transplant, no measures were taken to provide treatment to petitioner's residents who had tested positive for latent TB infections. JA70 (AR000070). The last communication between state officials and petitioner regarding the provision of such care occurred in January 2016. JA71 (AR000071).

---

[3] For a handful of residents, state health officials planned to perform a separate blood test. The state performed the test on some, but not all, of the identified residents. *See* JA70 (AR000070).

In June 2016, one of petitioner's residents complained of coughing and chest pain.  JA71 (AR000071).  The resident had tested positive for a latent TB infection during the prior round of testing but, like the rest of petitioner's residents, received no prophylactic treatment for the infection.  In August 2016, the resident began coughing up blood and was transferred to a hospital, where the resident tested positive for active TB.  JA71 (AR000071).

The diagnosis resulted in petitioner and state officials retesting all residents for TB.  No active infections were discovered, but twenty-three residents were found to have latent TB infections, seventeen of whom were identified as having latent TB infections in the prior rounds of testing.  JA71 (AR000071).  State officials prescribed prophylactic treatment for the residents who had tested positive for latent TB infections.  JA71 (AR000071).

**4.**     Following the TB outbreak, state health officials conducted a complaint survey to investigate whether petitioner had violated the Reform Act.  JA72 (AR000072); *see* 42 C.F.R. § 488.705.  As relevant here, Maryland officials determined that petitioner violated the requirement to establish and maintain an infection control program because petitioner "failed to ensure timely follow up of the treatment and management of

multiple residents who were identified at risk for exposure to a serious infectious disease"—that is, TB. JA72 (AR000072) (quotation marks omitted). Maryland officials further concluded that petitioner's violation "had placed residents in immediate jeopardy." JA72 (AR000072).

Petitioner contested that determination and invoked CMS's independent dispute resolution process to challenge the state findings, including the scope and severity of the deficiency. JA73 (AR000073). Following a meeting with state officials, the review upheld the noncompliance finding in a written order. *See* JA73 (AR000073).

CMS concurred with the state agency's findings and imposed a money penalty on petitioner for its violations. Specifically, CMS imposed a per-day penalty of $12,541 for the period when petitioner's violation exposed residents to immediate jeopardy, which CMS determined ran from June 14 through October 5, 2016. CMS imposed a further $330 per-day penalty for the remaining period of noncompliance, running from October 6 through December 11, 2016. The penalty amount was held in escrow pending the resolution of petitioner's administrative challenge.

**5.** Petitioner challenged the finding of noncompliance and the imposition of the money penalty before a Department of Health and Human Services administrative law judge (ALJ). Petitioner asserted that

CMS failed to establish a violation of the Reform Act's requirement to establish and maintain an infection control program. Petitioner further asserted that CMS clearly erred in finding that the violation subjected residents to immediate jeopardy, and that the money penalty was unreasonable. The ALJ rejected these challenges, concluding that petitioner "was not in substantial compliance with program participation requirements" and that the violation was an adequate basis for the imposition of money penalties, which were "also reasonable." JA60 (AR000060).

The ALJ concluded that CMS carried its burden of establishing that petitioner violated the Reform Act and its implementing regulations by failing to maintain an infection control policy. JA39 (AR000039) (citing 42 C.F.R. § 483.65). The ALJ explained that it was not enough for petitioner to "merely adopt an infection control policy" because the Reform Act "requires that the policy be implemented." JA37 (AR000037). Petitioner failed to do so because it did not "ensur[e] that residents identified as having latent TB infection were treated," JA43 (AR000043), as required by petitioner's own policy and procedures, *see* JA42 (AR000042); *see also* JA34 (AR000034) ("Petitioner concedes that a resident who had a [latent TB infection] should be treated at some time."). The ALJ rejected

petitioner's contention that "because it did not receive recommendations" from state officials on appropriate treatment "it should have no liability for its failure to control the TB outbreaks," explaining that even if state officials "did not promptly discharge [their] duties" that "cannot be a defense for [p]etitioner's failure to follow its infection control policy as required by 42 C.F.R. § 483.65." JA45-46 (AR000045-000046).

The ALJ further found that the record supported the finding of immediate jeopardy given "the risk associated with exposure to TB" and the fact that one of petitioner's residents developed an active TB infection. JA56 (AR000056). The ALJ also held that the per-day penalty amount— which was in the middle of the range of penalties amounts that may be imposed, *see* 42 C.F.R. § 488.438(a)(1)(i), (d)(2)—was reasonable "based on the facts." JA59 (AR000059).

**6.** Petitioner sought review of the ALJ's decision before the Department of Health and Human Services Departmental Appeals Board (Board). Petitioner advanced many of the same objections that it made before the ALJ, and also argued that the enforcement action violated petitioner's Seventh Amendment right to a jury trial. JA100 (AR000100).

The Board affirmed. It explained that petitioner failed "to comply with *its own TB infection control policy*—which is specifically required

under [42 C.F.R. §] 483.65." JA81 (AR000081). The Board rejected petitioner's contention that it should face no liability because "any adverse outcome in this case was the direct consequence of the [state agency's] failings," JA79 (AR000079), explaining that petitioner "had an independent duty to comply with its own infection control policy, mandated by participation in Medicare," and that "[p]etitioner's decision to abdicate its responsibilities to its residents and defer to the [state agency] was unacceptable," JA94 (AR000094).

The Board also rejected petitioner's remaining challenges. The Board concluded that CMS's immediate jeopardy determination was not clearly erroneous in light of the seriousness of the violation at issue. JA94 (AR000094). The Board likewise rejected petitioner's assertion that the ALJ's decision should be reversed because the enforcement proceeding was unconstitutional. *See* JA101 (AR000101). The Board thus affirmed the ALJ's decision and the imposition of a money penalty. JA101 (AR000101).

## SUMMARY OF ARGUMENT

**I.** Congress enacted the Federal Nursing Home Reform Act to ensure that nursing homes provide quality services to the Nation's elderly. Congress established a comprehensive scheme for regulating nursing homes that elect to participate in Medicare and Medicaid. The Reform Act

requires these facilities to "establish and maintain" infection control programs to provide a safe environment to residents and to prevent the transmission of infectious disease. Congress also authorized the Executive Branch to determine whether a facility violated these requirements and thus the terms for participation in Medicare and Medicaid. If there is a violation, the Secretary may expel the facility from the programs, may deny payments, may appoint a temporary manager for the facility to bring it into compliance, or the Secretary may impose money penalties. That system of executive adjudication is constitutional, and it is not necessary to invoke the power of a federal court before ordering any of those remedial measures.

The Seventh Amendment preserves the right to a jury trial and applies to private rights that are analogous to common law causes of action. But since the Founding, Congress has authorized executive officials to conduct adjudications of public rights and to impose money penalties without the use of a jury as factfinder. While the Supreme Court has not definitively delineated the precise contours of public and private rights, its precedents and historical practice have long recognized that the Executive may adjudicate disputes arising from public-benefits schemes. *See Crowell v. Benson*, 285 U.S. 22, 51 & n.13 (1932). And the Court has specifically

pointed to Medicare as a quintessential example of such a public-rights scheme. *Thomas v. Union Carbide Agric. Prods.*, 473 U.S. 568, 583, 588 (1985).

Executive adjudication was proper here because the Reform Act—like Medicare and Medicaid more broadly—deals with public rights, not private ones. Congress enacted the Reform Act to address widespread concerns about the quality of care that the Nation's elderly receive at nursing homes. Precisely because prior efforts to address such concerns proved inadequate, Congress imposed a comprehensive set of requirements on those facilities that elect to participate in Medicare and Medicaid and thus receive federal funds for reimbursement. Congress also enacted a novel enforcement scheme to ensure compliance with the Reform Act's requirements while minimizing the need to relocate residents from noncompliant facilities. That scheme has no parallel to any private action that individuals could bring at common law.

Petitioner and its amicus err in suggesting that a jury trial was required here simply because money penalties resemble "legal" remedies. Opening Br. 41. The Supreme Court has made clear that whether a civil award "implicates the Seventh Amendment," *SEC v. Jarkesy*, 603 U.S. 109, 125 (2024), is the beginning of the analysis, not the end. And longstanding

precedent and historical practice recognize that the Executive may determine public rights—particularly in connection with public-benefits schemes like Medicare and Medicaid—and can "enforce those [statutory] prohibitions with administrative penalties assessed without a jury." *Id.* at 129.

Petitioner and its amicus similarly err in suggesting that the enforcement of the Reform Act's infection control program resembles common law claims. Whether a nursing home established and maintained an adequate infection control program is defined by statute and CMS's implementing regulations, not common law principles. Petitioner's noncompliance is not traceable to the breach of a contractual promise or tort duty owed to one of its residents, and the United States is not stepping into the shoes of any injured beneficiary.

**II.** Petitioner's arbitrary-and-capricious claims fare no better. Petitioner contends that it lacked fair notice of the Reform Act's requirements and that the Board's noncompliance finding is not supported by substantial evidence. At bottom, however, both claims amount to the assertion that petitioner should face no liability because the state health agency failed to provide timely treatment recommendations. But as the Board explained in rejecting that exact argument, petitioner violated the

Reform Act because it had an independent duty to comply with its own infection control program, which specifically required petitioner to appropriately manage residents with latent TB infections. Petitioner was on notice of that obligation, and substantial record evidence shows that petitioner failed to meet it.

## STANDARD OF REVIEW

This Court will uphold the Board's decision unless it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see, e.g.*, *Putnam Ctr. v. U.S. Dep't of Health & Hum. Servs.*, 770 F. App'x 630, 638 (4th Cir. 2019). Factual findings are reviewed for substantial evidence and legal questions are reviewed de novo. *See Putnam Ctr.*, 770 F. App'x at 638.

## ARGUMENT

### I. Congress Constitutionally Authorized The Secretary To Adjudicate Violations Of The Reform Act.

Petitioner and its amicus principally argue that the Board's decision must be set aside because the imposition of a money penalty violated petitioner's Seventh Amendment right to a jury trial. *See* Opening Br. 38-44; Amicus Br. 10-24.[4] The argument misunderstands the framework of

---

[4] At times, petitioner and amicus frame the argument as challenging the "Secretary's Exhaustion Rule." Opening Br. 38; *see also* Amicus Br. 10.

*Continued on next page.*

the Seventh Amendment, which allows the Secretary to adjudicate statutory

violations and to impose money penalties in these circumstances.

### A.    Congress may assign adjudication of public rights to the Executive consistent with the Seventh Amendment.

The Seventh Amendment provides that "the right of trial by jury shall

be preserved" for "Suits at common law, where the value in controversy

shall exceed twenty dollars."  U.S. Const. amend. VII.  The Seventh

Amendment thus "preserve[s] the right to jury trial as it existed in 1791"

and applies to "statutory rights that are analogous to common-law causes of

action ordinarily decided in English law courts" at the Founding (as

opposed to claims in equity and admiralty).  *Granfinanciera, S.A., v.

Nordberg*, 492 U.S. 33, 42 (1989) (quotation marks omitted).

Courts conduct a two-part analysis when determining whether the

Seventh Amendment entitles the subject of an agency enforcement action

to a jury trial.  *See SEC v. Jarkesy*, 603 U.S. 109, 120 (2024).  "The

threshold issue is whether [the] action implicates the Seventh

Amendment."  *Id.*  A claim for punitive "money damages" without equitable

---

But the statutory review scheme providing for adjudication before the agency with review in the court of appeals was enacted by Congress, *see* 42 U.S.C. § 1395i-3(h)(2)(B)(ii); it is not a product of the Secretary's rulemaking.  In any event, petitioner's challenge is to the absence of a jury as a factfinder, not to the requirement to appear before the agency in the first instance.

considerations is a "prototypical common law remedy" that implicates the Seventh Amendment. *Id.* at 123. Accordingly, the government does not contest that the money penalty challenged here "implicates the Seventh Amendment." *Id.* at 125.

But that is the beginning of the analysis, not the end. Courts next ask "whether Congress may assign" adjudication of the matter "to a non-Article III adjudicative body that does not use a jury as factfinder." *Granfinanciera*, 492 U.S. at 42; *accord Jarkesy*, 603 U.S. at 120 (employing "the approach set forth in *Granfinanciera*"). In delineating which matters may be determined by the Executive, the Supreme Court has distinguished between "public rights" and "private rights." *Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, 584 U.S. 325, 334 (2018). Private rights, "the stuff of the traditional actions at common law tried by the courts at Westminster in 1789," are generally reserved to Article III courts. *Stern v. Marshall*, 564 U.S. 462, 484 (2011) (quotation marks omitted). Violations of public rights, by contrast, may be adjudicated by the Executive Branch "free from the strictures of the Seventh Amendment," *Granfinanciera*, 492 U.S. at 51, as this Court has recognized, *see Sasser v. Administrator, U.S. EPA*, 990 F.2d 127, 130 (4th Cir. 1993) ("[T]he Seventh Amendment does not apply to disputes over

statutory public rights …").  Thus, "since the beginning of the Republic,"

executive officials have "conduct[ed] adjudications," which may take

"'judicial' forms" but are ultimately "exercises of … the 'executive Power.'"

*City of Arlington v. FCC*, 569 U.S. 290, 304 n.4 (2013).

The Supreme Court has never definitively identified the

distinguishing features of public rights.  But the Court's "precedents have

recognized that the [public-rights] doctrine covers matters 'which arise

between the Government and persons subject to its authority in connection

with the performance of the constitutional functions of the executive or

legislative departments.'"  *Oil States*, 584 U.S. at 334 (quoting *Crowell v.

Benson*, 285 U.S. 22, 50 (1932)).  It is thus well established that the

Executive may adjudicate matters arising from "the exercise of the

congressional power as to interstate and foreign commerce, taxation,

immigration, the public lands, public health, the facilities of the post office,

pensions, and payments to veterans."  *Crowell*, 285 U.S. at 51; *see also

Jarkesy*, 603 U.S. at 130 (identifying "categories of adjudications [that] fall

within the exception").  The Supreme Court has not categorically limited

public rights to these specifically identified areas, but it has clarified that

the doctrine does not extend to "[w]holly private tort, contract, and

property cases, as well as a vast range of other cases." *Granfinanciera*, 492 U.S. at 51 (quotation marks omitted).

In *SEC v. Jarkesy*, the Supreme Court considered whether the Securities and Exchange Commission could use an administrative proceeding to impose civil monetary penalties when a person had violated the federal securities laws' "antifraud provisions," which "replicate common law fraud." 603 U.S. at 120. The Court explained that although the relevant securities provisions were part of a "newly fashioned regulatory scheme," the alleged fraud violations were "a common law suit in all but name," and so did not involve public rights. *Id.* at 135-36 (quotation marks omitted). Instead, the enforcement action "target[ed] the same basic conduct as common law fraud," under a statute that "employ[ed] the same terms of art, and operate[d] pursuant to similar legal principles" to the common law. *Id.* at 134. In so holding, *Jarkesy* reiterated that Congress may direct the Executive to adjudicate matters of public rights—"[i]n contrast to common law claims"—and to impose penalties for their violation. *Id.* at 128.

## B. Petitioner's violation of the Reform Act implicates public rights, not private rights.

Congress validly assigned to the Secretary the authority to adjudicate enforcement actions seeking money penalties against nursing homes that violate the Reform Act because such adjudications involve public rights.

28

The statute deals with public rights "in connection with the exercise of the congressional power" over government programs that use federal funds for the public benefit. *Crowell*, 285 U.S. at 51. Like regulatory regimes involving "pensions," "payments to veterans," and other public benefits, the Reform Act's requirements for facilities that voluntarily participate in Medicare and Medicaid are a "[f]amiliar illustration[]" of a public-rights scheme. *Id.* Although Congress may choose to assign adjudication of Reform Act violations to the federal judiciary, "the mode of determining matters of this class is completely within congressional control," and Congress "may delegate that power to executive officers." *Id.* at 50 (quoting *Ex parte Bakelite Corp.*, 279 U.S. 438, 451 (1929)). Here, Congress permissibly authorized the Secretary to adjudicate statutory violations and to impose money penalties.

1.     Since the Founding, Congress has directed the Executive to adjudicate claims relating to public-benefits programs. The first Congresses tasked the Secretary of War with adjudicating whether veterans of the Revolutionary War were entitled to military pensions. *See* Harold J. Krent, *Presidential Control of Adjudication Within the Executive Branch*, 65 Case W. Res. L. Rev. 1083, 1089-90 (2015) (citing Act of Sep. 29, 1789, ch. 24, 1 Stat. 95). Following the War of 1812, Congress provided that "all

veterans could receive benefits if they could show that they had served and were in 'reduced circumstances,'" and "Congress vested in the executive full control over management of the process." *Id.* at 1090 (citing Act of Mar. 18, 1818, ch. 19, 3 Stat. 410). It is thus unsurprising that in *Crowell*, the Supreme Court pointed to decisions concerning "pensions" and "payments to veterans" as "[f]amiliar illustrations" of public-rights schemes. *Crowell*, 285 U.S. at 51 & n.13; *cf. United States v. Teller*, 107 U.S. 64, 68 (1883) ("Pensions are the bounties of the government, which congress has the right to give, withhold, distribute, or recall, at its discretion.").

Similarly, early Congresses authorized the Executive to adjudicate individual claims for money appropriated to benefit certain classes of beneficiaries. A 1794 statute appropriated a sum "for the relief of persons resident in the United States who had fled the insurrection in Saint Domingo" and authorized the "President to withdraw and distribute funds 'in such manner, and by the hands of such persons, as shall, in the opinion of the President, appear most conducive to the humane purposes of this act.'" Jerry L. Mashaw, *Recovering American Administrative Law: Federalist Foundations, 1787-1801*, 115 Yale L.J. 1256, 1298 (2006) (quoting Act of Feb. 12, 1794, ch. 2, 6 Stat. 13). Another 1794 statute appropriated funds for property damaged or destroyed during the Whiskey

Rebellion.  The statute gave the President the authority, acting through a

"'board of inquest'" "to determine the extent of the damages and then to

distribute money '[t]o aid such of the said sufferers as, in his opinion, stand

in need of immediate assistance.'"  *Id.*  (alteration in original) (quoting 4

Annals of Cong. 10001-02 (1794)).  President Washington appointed

commissioners, who "took applications, investigated claims, ... interviewed

witnesses," and disbursed money "to those whom the board found

deserving."  *Id.*

The early practice has endured to the present.  The Supreme Court

has explained that Congress has validly authorized the Executive to

adjudicate many claims arising under the Medicare, Medicaid, and Social

Security programs, as well as other public-benefits schemes.  In *Thomas v.

Union Carbide Agricultural Products*, 473 U.S. 568 (1985), the Court

addressed whether Congress could assign the resolution of disputes among

participants in a voluntary pesticide registration scheme to binding

arbitration with only limited judicial review.  The Court held that under the

public-rights doctrine, the "scheme adopted by Congress d[id] not

contravene Article III" because it "serve[d] a public purpose as an integral

part of a program safeguarding the public health."  *Id.* at 589.  "Congress

has the power," the Court explained, "to authorize an agency administering

a complex regulatory scheme to allocate costs and benefits among voluntary participants in the program without providing an Article III adjudication." *Id*. Congress "also has the power to condition issuance of registrations or licenses on compliance with agency procedure." *Id*.

As relevant here, *Union Carbide* repeatedly cited Medicare as an example of a comparable public-rights scheme. *See* 473 U.S. at 583, 588. The Court explained that disputes over Medicare payments "involve the application of legal standards to facts and affect private interests," and yet those disputes are "routinely decided by agency action with limited or no review by Article III courts." *Id*. at 583 (citing *United States v. Erika, Inc.,* 456 U.S. 201, 206 (1982)). The Court further pointed out that there is "no review" of certain disputes over Medicare reimbursements, *id*. at 583, and that "private insurance carrier[s]" are often assigned the "task of deciding" certain "Medicare claims," *id*. at 589.

Since even "mundane" factual disputes in matters implicating private rights must be determined by an Article III court, *Stern*, 564 U.S. at 484, Medicare's adjudicative scheme comports with Article III because the program concerns public rights—if it concerned private rights, all such disputes would need to be adjudicated in federal court. But that is not mandated by Article III or the Seventh Amendment. Because these public-

benefits programs concern public rights, the Executive Branch can constitutionally determine benefit payments and eligibility to participate, and it can recoup payments or impose penalties when there have been violations. *See Austin v. Shalala*, 994 F.2d 1170, 1177-78 (5th Cir. 1993) (explaining that "Congress may employ an administrative body as a factfinder in imposing money penalties for the violation of federal laws" concerning public rights and "to recover overpayments of government largess").

**2.**     The Reform Act stands on the same footing as other public-rights schemes involving the use of federal funds for public-benefits programs. The statute vindicates uniquely sovereign interests of the United States in determining how federal programs allocate taxpayer dollars to provide medical care to eligible recipients of the Medicare and Medicaid programs. Congress was well within its prerogatives to prescribe that—as a condition of receiving federal reimbursement—nursing homes must "provide quality services" to the Nation's elderly and thereby address widespread "concerns about the poor condition of such facilities." *Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 181 (2023); *see also* 42 U.S.C. § 1395i-3(f)(1) (requiring the Secretary "to assure that requirements which govern the provision of care" in nursing homes "are

adequate to protect the health, safety, welfare, and rights of residents and to promote the effective and efficient use of public moneys"). Prior to the Reform Act's enactment, Congress found "broad consensus" that the then-current "government regulation of nursing homes … allow[ed] too many marginal or substandard nursing homes to continue i[n] operation," resulting in individuals "reciev[ing] very inadequate—sometimes shockingly deficient—care that [was] likely to hasten the deterioration of their physical, mental, and emotional health." H.R. Rep. No. 100-391, pt. 1, at 452 (1987) (quotation marks omitted).

Precisely because past regulatory efforts were "not satisfactory," Congress made "major revisions" to the regulatory scheme "to improve the quality of care" for Medicare beneficiaries and to "bring substandard facilities into compliance" with "quality of care requirements." H.R. Rep. No. 100-391, pt. 1, at 452 (quotation marks omitted). As detailed above, Congress required nursing homes to meet a variety of quality-of-care requirements to "promote maintenance or enhancement of the quality of life of each resident." 42 U.S.C. § 1395i-3(b)(1)(A). As relevant here, nursing homes must "establish and maintain an infection control program designed to provide a safe, sanitary, and comfortable environment in which residents reside and to help prevent the development and transmission of

disease and infection." *Id.* § 1395i-3(d)(3)(A). The requirements for such programs are set forth in detailed regulations promulgated by the Secretary. *See* 42 C.F.R. § 483.65 (2016). These statutory and regulatory requirements, not common law principles, define the circumstances under which there has been a violation of the law. It would do a court no good to look to the common law in evaluating whether a violation occurred because the Reform Act does not "operate pursuant to similar legal principles." *Jarkesy*, 603 U.S. at 134; *cf. id.* at 125-26 (explaining that courts "often consider common law fraud principles when interpreting federal securities law").

Congress also established a novel scheme to enforce the Reform Act's requirements. Congress found the poor conditions of nursing facilities to be "partly due to widespread noncompliance with existing federal and state laws." *Talevski*, 599 U.S. at 181. Although the Secretary could always terminate a noncompliant facility's participation in Medicare, Congress determined that "a set of intermediate sanctions" short of termination was necessary given the "difficulty and undesirability of relocating residents" of a facility whose funding was terminated. H.R. Rep. No. 100–391, pt. 1, at 471. Congress thus authorized the Secretary to deny payment to a violative facility until it satisfied the Reform Act's requirements, or to appoint a

temporary manager to bring the facility into compliance. 42 U.S.C. § 1395i-3(h)(2)(B)(i), (iii). The Secretary may take any of these actions without first invoking the power of a federal court because they are matters of public rights that Congress "may delegate ... to executive officers." *Ex parte Bakelite Corp.*, 279 U.S. at 451. If these were private rights, they would have to be adjudicated by an Article III court, *Jarkesy*, 603 U.S. at 127, but not even petitioner argues for such an unsupportable result.

Congress's decision to also authorize the imposition of money penalties for Reform Act violations does not transform these matters of public rights into private ones. 42 U.S.C. § 1395i-3(h)(2)(B)(ii). Indeed, the Supreme Court recently reaffirmed that Congress can enforce statutory prohibitions concerning public rights "with administrative penalties assessed without a jury." *Jarkesy*, 603 U.S. at 129. In doing so, the Court relied on *Oceanic Steam Navigation Co. v. Stranahan*, 214 U.S. 320 (1909), which upheld a civil penalty imposed by the Secretary of Commerce for a violation of statutes that prohibited the importation of persons with "dangerous contagious diseases" like tuberculosis, *id.* at 337.

Nor does the Reform Act seek to replicate the common law—indeed, it was "because traditional rights and remedies were inadequate to cope with a manifest public problem," that Congress in the Reform Act created "a new

cause of action, and remedies therefor, unknown to the common law." *Granfinanciera*, 492 U.S. at 60 (quotation marks omitted). "In both concept and execution," the statutory scheme was "self-consciously novel." *Jarkesy*, 603 U.S. at 137.

The Reform Act's requirements for Medicare providers, moreover, share many of the same critical features as the pesticide registration scheme at issue in *Union Carbide*. Medicare is a "complex regulatory scheme" in which participation is voluntary. 473 U.S. at 589; *see also Almy v. Sebelius*, 679 F.3d 297, 302 (4th Cir. 2012) (explaining that "Medicare regulation is technical and complex" (quotation marks omitted)). Nursing homes like petitioner are not legally compelled to participate in Medicare, which "is voluntary." *Boehringer Ingelheim Pharms., Inc. v. U.S. Dep't of Health & Hum. Servs.*, 150 F.4th 76, 88 n.7 (2d Cir. 2025); *see also Minnesota Ass'n of Health Care Facilities, Inc. v. Minnesota Dep't of Pub. Welfare*, 742 F.2d 442, 446 (8th Cir. 1984) ("Despite the strong financial inducement to participate in Medicaid, a nursing home's decision to do so is nonetheless voluntary."). And the Reform Act "serves a public purpose as an integral part" of Medicare and the broader goal of "safeguarding the public health," *Union Carbide*, 473 U.S. at 589, by ensuring that Medicare beneficiaries receive quality care when treated at nursing homes. In the

context of such a program, Congress may authorize the Executive to "allocate costs and benefits among voluntary participants in the program without providing an Article III adjudication." *Id.*; *see also Jarkesy*, 603 U.S. at 130 (identifying the "granting of public benefits" as one of the "categories of adjudications [that] fall within the [public-rights] exception").

### C. Petitioner's and amicus's Seventh Amendment arguments are unavailing.

The arguments advanced by petitioner and amicus as to why the imposition of a money penalty here violated the Seventh Amendment are unavailing.

**1.** At the outset, amicus wrongly suggests that a jury right attaches whenever "a case implicates the Seventh Amendment." Amicus Br. 17. That is incorrect: whether the money penalty challenged here "implicates the Seventh Amendment," *Jarkesy*, 603 U.S. at 125, is the beginning of the analysis, not the end. Otherwise, there would never be any public-rights analysis at all. The Supreme Court has never endorsed such a categorical proposition; to the contrary, it affirmed in *Jarkesy* that Congress can direct the Executive to impose money "penalties ... without a jury" for the violation of public rights. *Id.* at 129; *see also Oil States*, 584 U.S. 325 at 345 ("[W]hen Congress properly assigns a matter to adjudication in a non-

Article III tribunal, the Seventh Amendment poses no independent bar to the adjudication of that action by a nonjury factfinder." (quotation marks omitted)).

**2.** Amicus also errs in asserting that the public-rights doctrine does not apply to public-benefits programs like Medicare. Amicus Br. 23 (questioning the doctrine's "existence" in such contexts). That argument ignores historical practice dating to the Founding in which Congress has assigned authority to the Executive to adjudicate claims relating to public-benefits programs. It also ignores that the Supreme Court has long recognized such programs are a "[f]amiliar illustration[]" of a public-rights scheme. *Crowell*, 285 U.S. at 51. And it ignores that in *Union Carbide*, the Supreme Court repeatedly cited the Medicare program as an example of a public-rights scheme that entailed executive adjudication of claims, even where they "involve[d] the application of legal standards to facts and affect[ed] private interests." 473 U.S. at 583. Indeed, neither amicus nor petitioner even addresses *Union Carbine* or the other court decisions recognizing that public-benefits programs like Medicare involve public rights, not private ones.

Amicus wrongly characterizes the government's position as encompassing anything concerning public health. Amicus Br. 23. As

explained, claims arising under the Reform Act's Medicare provisions fall under the public-rights doctrine because the statutory scheme involves the use of federal funds for "the granting of public benefits." *Jarkesy*, 603 U.S. at 130. That the Reform Act advances the "longstanding national commitment to provide safe and dignified care for the elderly," *Talevski*, 599 U.S. at 180-81, only underscores that the scheme serves uniquely sovereign interests. Indeed, the Supreme Court has specifically recognized that in certain contexts the "exercise of the congressional power" to regulate "public health" may implicate public rights. *Crowell*, 285 U.S. at 51 & n.13 (citing *Houston v. St. Louis Indep. Packing Co.*, 249 U.S. 479 (1919)); *see also Union Carbide*, 473 U.S. at 584. And public rights certainly include programs like the Reform Act that "serve[] a public purpose" and "safeguard[] the public health." *Union Carbide*, 473 U.S. at 589. That is why the Secretary can expel facilities from Medicare, deny them payments, and appoint temporary management for violating the statute without first seeking permission from a federal court.

**3.** Finally, petitioner and amicus mistakenly assert that "even if some components of the Medicare or Medicaid Acts, or the [Reform Act] in particular, create 'public rights,' ..., [that] does not necessitate agency adjudication" here because, they say, the enforcement action resembles

common law tort and contract claims.  Amicus Br. 23-24; *see also* Opening Br. 42-43.

Petitioner and amicus cannot disassociate the violations here from the broader Medicare scheme.  The Supreme Court in *Union Carbide* did not evaluate the challenged arbitration scheme in isolation; instead, the Court upheld the scheme because it served as an "integral part" of a broader public-rights program.  473 U.S. at 589.  The same is true of the Reform Act and its requirements related to implementing and maintaining an infection control program.  The statute broadly ensures that Medicare beneficiaries receive quality care when treated in nursing homes.  And the infection control requirement in particular ensures that such facilities provide Medicare beneficiaries with "a safe, sanitary, and comfortable environment" to "prevent the development and transmission of disease and infection."  42 C.F.R. § 483.65 (2016).  Simply put, Congress chose not to have Medicare pay for nursing-home services when those facilities lacked the required processes that would safeguard their residents from dangerous infectious diseases.  And when facilities that chose to participate in Medicare failed to comply with those statutory requirements, Congress prescribed consequences.

The Reform Act and its infection control requirements, moreover, do not resemble common law tort and contract claims.  Like the Medicare and Medicaid programs more broadly, the Reform Act creates "duties owed 'to the whole community, considered as a community, in its social aggregate capacity.'"  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 345 (2016) (Thomas, J., concurring) (quoting 4 William Blackstone, *Commentaries on the Laws of England* *5 (1769)).  It does not seek to "regulate transactions between private individuals," *Jarkesy*, 603 U.S. at 135, or to determine "the liability of one individual to another" in a manner that would implicate private rights, *Crowell*, 285 U.S. at 51.  Petitioner's liability is not traceable to the breach of a contractual promise or tort duty owed to one of its residents, and the United States is not stepping into the shoes of any injured beneficiary.  Rather, petitioner's liability derives from its voluntary choice to participate in Medicare and its failure to adhere to the Reform Act's requirements for establishing and maintaining an infection control program.

Petitioner and amicus contend that the enforcement action is akin to a contract claim because to participate in Medicare petitioner entered into a provider agreement with CMS that obligated it to follow applicable regulations.  Opening Br. 42; Amicus Br. 15 & n.5.  But that proves far too

much.  All providers that elect to participate in Medicare and Medicaid do so pursuant to provider agreements, and no court has ever suggested that the mere existence of such an agreement renders every administrative action to enforce a Medicare or Medicaid regulatory requirement a matter of private rights.  Indeed, under that theory, all claims for Medicare reimbursement would seem to be private contract rights that could not be decided administratively in the first instance.  Petitioner and amicus cite no authority to support that sweeping proposition.  *See, e.g.*, *Memorial Hosp. v. Heckler*, 706 F.2d 1130, 1136 (11th Cir. 1983) ("Upon joining the Medicare program, … the hospitals received a statutory entitlement, not a contractual right."); *cf. Lancaster Hosp. Corp. v. Becerra*, 58 F.4th 124, 127 (4th Cir. 2023) (reviewing the agency's denial of Medicare reimbursement for substantial evidence and compliance with the Administrative Procedure Act).

Petitioner and amicus similarly err in likening the enforcement action to a common law tort claim.  Amicus Br. 21; Opening Br. 42.  As explained, whether a facility established and maintained an adequate infection control program is defined by statute and CMS's implementing regulations.  *See* 42 U.S.C. § 1395i-3(b)(1)(A); 42 C.F.R. § 483.65 (2016).  Neither petitioner nor amicus point to any analogous requirement that applied at common law,

much less one that "employ[ed] the same terms of art, and operate[d] pursuant to similar legal principles." *Jarkesy*, 603 U.S. at 134.  Petitioner, moreover, violated the Reform Act not because it flouted "common law principles of reasonableness," as amicus suggests, Amicus Br. 21, but because petitioner failed to adhere to its own written policy for treating latent TB infections.  Petitioner would have been noncompliant even if no resident suffered harm or ever developed an active TB infection.  *See Liberty Commons Nursing & Rehab Center—Johnston v. Leavitt*, 241 F. App'x 76, 80 (4th Cir. 2007) (per curiam) (explaining that "no actual harm to a resident is required for an 'immediate jeopardy' finding" under the Reform Act).  The violation at issue here thus operates on fundamentally different principles than a common law claim premised on "professional standards of care."  Amicus Br. 21.[5]

---

[5] As a "corollary" to its Seventh Amendment challenge, petitioner asserts that the Secretary should not have "'escrowed' funds pending" the administrative proceeding.  Opening Br. 44.  To the extent petitioner intends to assert an independent challenge to the Reform Act's escrow provision based on due-process principles, that claim would fail because petitioner was afforded notice and an opportunity to be heard prior to the funds being escrowed as well as a full review after the fact.  *See Doolin Sec. Sav. Bank, F.S.B. v. FDIC*, 53 F.3d 1395, 1404 (4th Cir. 1995); *see also Cathedral Rock of N. Coll. Hill, Inc. v. Shalala*, 223 F.3d 354, 364 (6th Cir. 2000) ("Medicare provider is not entitled to hearing before the termination of its provider agreement").

## II. Petitioner's Remaining Claims Are Without Merit.

Petitioner also challenges the Board's decision on the ground that it was based on an "'ad hoc' rationale" and was not supported by the record. Opening Br. 37; *see also* Opening Br. 44-51.[6] Neither argument withstands scrutiny.

Both claims erroneously assert that petitioner should face no liability because the state health agency purportedly failed to fulfill its responsibility of providing treatment recommendations for petitioner's residents with latent TB infections. But as the Board explained in rejecting this exact argument, petitioner "had an independent duty to comply with its own infection control policy, mandated by participation in Medicare," which obligated petitioner "to appropriately manage the residents with" latent TB infections. JA94 (AR000094). Specifically, petitioner's policy provided that where a medical evaluation showed a latent TB infection, petitioner was required to proceed with "evaluation for chemoprophylaxis"—i.e., a prophylactic drug treatment. JA174 (AR002035).

---

[6] Amicus also criticizes the Board more broadly, Amicus Br. 4-9, but none of those criticisms appear relevant to petitioner's claims and thus should be disregarded by this Court. *See Snyder v. Phelps*, 580 F.3d 206, 216 (4th Cir. 2009) ("[O]ur Court and our sister circuits have consistently been wary, even prohibitive, of addressing an issue raised solely by an amicus."), *aff'd*, 562 U.S. 443 (2011).

The Board correctly determined that petitioner failed to meet that obligation. After being exposed to individuals with active TB infections, dozens of petitioner's residents tested positive for latent TB infections across May and August of 2015. State officials explained to petitioner that its staff "would be responsible for testing its residents for TB and for follow up treatment," including "prophylactic treatment to individuals with [latent TB infections]," and that anyone that tested positive for a latent TB infection should "receive prophylactic treatment unless contraindicated." JA69 (AR000069). Petitioner then failed to ensure its residents received such treatment in a timely manner. There is no indication that petitioner timely followed up with state health officials to ensure treatment for its residents; indeed, even petitioner acknowledges that at "some" point its "staff should have realized" that residents were not being adequately treated. Opening Br. 50; *see also* JA34 (AR000034) (conceding that a "resident who had [a latent TB infection] should be treated at some time"). Nonetheless, petitioner did not act for months. It was not until a resident— who tested positive for a latent TB infection and received no care— developed an active infection and was hospitalized that petitioner took steps to ensure residents who had previously tested positive for latent TB infections received adequate treatment. Thus, as the Board explained, even

46

if state health officials fell short of fulfilling their duty, that in no way excused petitioner's own "failure to fulfill its responsibility under its infection control policy to evaluate the residents having [latent TB infections] for treatment." JA95 (AR000095).

Petitioner mistakenly compares this case to *Golden Living Center— Mountain View v. Secretary of Health & Human Services*, 832 F. App'x 967 (6th Cir. 2020), which bears no resemblance to the issues here. There, the Sixth Circuit held that a CMS regulation requiring periodic review of patient care plans failed to give a facility adequate notice that "it must specifically consider increased staffing and review each patient's care plan after every" time a patient fell at the facility. *Id.* at 969. Here, by contrast, petitioner was plainly on notice of its obligation to "establish and maintain an infection control program." 42 U.S.C. § 1395i-3(d)(3)(A). And petitioner's own TB infection control program required it to provide adequate treatment for patients with latent TB infections. Petitioner's liability thus was "not based on any implied obligation," but from its "failure to comply with *its own TB infection control policy*." JA81 (AR000081).

## CONCLUSION

For the foregoing reasons, the petition for review should be denied.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

MICHAEL S. RAAB
DANIEL AGUILAR
*s/ David L. Peters*
DAVID L. PETERS
*Attorney, Appellate Staff*
*Civil Division*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 598-6735*

December 2025

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 9,624 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Georgia 14-point font, a proportionally spaced typeface.

*s/ David L. Peters*

David L. Peters

**CERTIFICATE OF SERVICE**

I hereby certify that on December 17, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system.

*s/ David L. Peters*
David L. Peters

**ADDENDUM**

## TABLE OF CONTENTS

42 U.S.C. § 1320a-7a ...................................................................... A1

42 U.S.C. § 1395i-3 .......................................................................A3

**42 U.S.C. § 1320a-7a**

**§ 1320a-7a. Civil monetary penalties**

...

(c) Initiation of proceeding; authorization by Attorney General, notice, etc., estoppel, failure to comply with order or procedure

(1) The Secretary may initiate a proceeding to determine whether to impose a civil money penalty, assessment, or exclusion under subsection (a) or (b) only as authorized by the Attorney General pursuant to procedures agreed upon by them. The Secretary may not initiate an action under this section with respect to any claim, request for payment, or other occurrence described in this section later than six years after the date the claim was presented, the request for payment was made, or the occurrence took place. The Secretary may initiate an action under this section by serving notice of the action in any manner authorized by Rule 4 of the Federal Rules of Civil Procedure.

(2) The Secretary shall not make a determination adverse to any person under subsection (a) or (b) until the person has been given written notice and an opportunity for the determination to be made on the record after a hearing at which the person is entitled to be represented by counsel, to present witnesses, and to cross-examine witnesses against the person.

(3) In a proceeding under subsection (a) or (b) which—

(A) is against a person who has been convicted (whether upon a verdict after trial or upon a plea of guilty or nolo contendere) of a Federal crime charging fraud or false statements, and

(B) involves the same transaction as in the criminal action, the person is estopped from denying the essential elements of the criminal offense.

(4) The official conducting a hearing under this section may sanction a person, including any party or attorney, for failing to comply with an order or procedure, failing to defend an action, or other misconduct as would interfere with the speedy, orderly, or fair conduct of the hearing. Such sanction shall reasonably relate to the severity and nature of the failure or misconduct. Such sanction may include—

(A) in the case of refusal to provide or permit discovery, drawing negative factual inferences or treating such refusal as an admission by deeming the matter, or certain facts, to be established,

(B) prohibiting a party from introducing certain evidence or otherwise supporting a particular claim or defense,

(C) striking pleadings, in whole or in part,

(D) staying the proceedings,

(E) dismissal of the action,

(F) entering a default judgment,

(G) ordering the party or attorney to pay attorneys' fees and other costs caused by the failure or misconduct, and

(H) refusing to consider any motion or other action which is not filed in a timely manner.

(d) Amount or scope of penalty, assessment, or exclusion

In determining the amount or scope of any penalty, assessment, or exclusion imposed pursuant to subsection (a) or (b), the Secretary shall take into account—

(1) the nature of claims and the circumstances under which they were presented,

(2) the degree of culpability, history of prior offenses, and financial condition of the person presenting the claims, and

(3) such other matters as justice may require.

(e) Review by courts of appeals

Any person adversely affected by a determination of the Secretary under this section may obtain a review of such determination in the United States Court of Appeals for the circuit in which the person resides, or in which the claim or specified claim was presented, by filing in such court (within sixty days following the date the person is notified of the Secretary's determination) a written petition requesting that the determination be modified or set aside. A copy of the petition shall be forthwith transmitted by the clerk of the court to the Secretary, and thereupon the Secretary shall file in the Court [11] the record in the proceeding as provided in section 2112 of title 28. Upon such filing, the court shall have jurisdiction of the proceeding and of the question determined therein, and shall have the power to make and enter upon the pleadings, testimony, and proceedings set forth in such record a decree affirming, modifying, remanding for further consideration, or setting aside, in whole or in part, the determination of the Secretary and enforcing the same to the extent that

such order is affirmed or modified. No objection that has not been urged before the Secretary shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances. The findings of the Secretary with respect to questions of fact, if supported by substantial evidence on the record considered as a whole, shall be conclusive. If any party shall apply to the court for leave to adduce additional evidence and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for the failure to adduce such evidence in the hearing before the Secretary, the court may order such additional evidence to be taken before the Secretary and to be made a part of the record. The Secretary may modify his findings as to the facts, or make new findings, by reason of additional evidence so taken and filed, and he shall file with the court such modified or new findings, which findings with respect to questions of fact, if supported by substantial evidence on the record considered as a whole, shall be conclusive, and his recommendations, if any, for the modification or setting aside of his original order. Upon the filing of the record with it, the jurisdiction of the court shall be exclusive and its judgment and decree shall be final, except that the same shall be subject to review by the Supreme Court of the United States, as provided in section 1254 of title 28.

...

**42 U.S.C. § 1395i-3**

**§ 1395i-3. Requirements for, and assuring quality of care in, skilled nursing facilities**

...

(d) Requirements relating to administration and other matters

...

    (3) Sanitary and infection control and physical environment

    A skilled nursing facility must—

        (A) establish and maintain an infection control program designed to provide a safe, sanitary, and comfortable environment in which residents reside and to help prevent the development and transmission of disease and infection, and

        (B) be designed, constructed, equipped, and maintained in a manner to protect the health and safety of residents, personnel, and the general public.

...

(h) Enforcement Process

(1) In general. If a State finds, on the basis of a standard, extended, or partial extended survey under subsection (g)(2) or otherwise, that a skilled nursing facility no longer meets a requirement of subsection (b), (c), or (d), and further finds that the facility's deficiencies—

(A) immediately jeopardize the health or safety of its residents, the State shall recommend to the Secretary that the Secretary take such action as described in paragraph (2)(A)(i); or

(B) do not immediately jeopardize the health or safety of its residents, the State may recommend to the Secretary that the Secretary take such action as described in paragraph (2)(A)(ii).

If a State finds that a skilled nursing facility meets the requirements of subsections (b), (c), and (d), but, as of a previous period, did not meet such requirements, the State may recommend a civil money penalty under paragraph (2)(B)(ii) for the days in which it finds that the facility was not in compliance with such requirements.

(2) Secretarial Authority

(A) In general. With respect to any skilled nursing facility in a State, if the Secretary finds, or pursuant to a recommendation of the State under paragraph (1) finds, that a skilled nursing facility no longer meets a requirement of subsection (b), (c), (d), or (e), and further finds that the facility's deficiencies—

(i) immediately jeopardize the health or safety of its residents, the Secretary shall take immediate action to remove the jeopardy and correct the deficiencies through the remedy specified in subparagraph (B)(iii), or terminate the facility's participation under this subchapter and may provide, in addition, for one or more of the other remedies described in subparagraph (B); or

(ii) do not immediately jeopardize the health or safety of its residents, the Secretary may impose any of the remedies described in subparagraph (B).

Nothing in this subparagraph shall be construed as restricting the remedies available to the Secretary to remedy a skilled nursing facility's deficiencies. If the Secretary finds, or pursuant to the recommendation of the State under paragraph (1) finds, that a skilled nursing facility meets

such requirements but, as of a previous period, did not meet such requirements, the Secretary may provide for a civil money penalty under subparagraph (B)(ii) for the days on which he finds that the facility was not in compliance with such requirements.

(B) Specified remedies. The Secretary may take the following actions with respect to a finding that a facility has not met an applicable requirement:

(i) Denial of payment. The Secretary may deny any further payments under this subchapter with respect to all individuals entitled to benefits under this subchapter in the facility or with respect to such individuals admitted to the facility after the effective date of the finding.

(ii) Authority with respect to civil money penalties

(I) In general. Subject to subclause (II), the Secretary may impose a civil money penalty in an amount not to exceed $10,000 for each day of noncompliance. The provisions of section 1320a–7a of this title (other than subsections (a) and (b)) shall apply to a civil money penalty under the previous sentence in the same manner as such provisions apply to a penalty or proceeding under section 1320a–7a(a) of this title.

(II) Reduction of civil money penalties in certain circumstances. Subject to subclause (III), in the case where a facility self-reports and promptly corrects a deficiency for which a penalty was imposed under this clause not later than 10 calendar days after the date of such imposition, the Secretary may reduce the amount of the penalty imposed by not more than 50 percent.

(III) Prohibitions on reduction for certain deficiencies

(aa) Repeat deficiencies. The Secretary may not reduce the amount of a penalty under subclause (II) if the Secretary had reduced a penalty imposed on the facility in the preceding year under such subclause with respect to a repeat deficiency.

(bb) Certain other deficiencies. The Secretary may not reduce the amount of a penalty under subclause (II) if the penalty is imposed on the facility for a deficiency that is found to result in a pattern of harm or widespread harm, immediately jeopardizes the health or safety of a resident or residents of the facility, or results in the death of a resident of the facility.

(IV) Collection of civil money penalties. In the case of a civil money penalty imposed under this clause, the Secretary shall issue regulations that—

(aa) subject to item (cc), not later than 30 days after the imposition of the penalty, provide for the facility to have the opportunity to participate in an independent informal dispute resolution process which generates a written record prior to the collection of such penalty;

(bb) in the case where the penalty is imposed for each day of noncompliance, provide that a penalty may not be imposed for any day during the period beginning on the initial day of the imposition of the penalty and ending on the day on which the informal dispute resolution process under item (aa) is completed;

(cc) may provide for the collection of such civil money penalty and the placement of such amounts collected in an escrow account under the direction of the Secretary on the earlier of the date on which the informal dispute resolution process under item (aa) is completed or the date that is 90 days after the date of the imposition of the penalty;

(dd) may provide that such amounts collected are kept in such account pending the resolution of any subsequent appeals;

(ee) in the case where the facility successfully appeals the penalty, may provide for the return of such amounts collected (plus interest) to the facility; and

(ff) in the case where all such appeals are unsuccessful, may provide that some portion of such amounts collected may be used to support activities that benefit residents, including assistance to support and protect residents of a facility that closes (voluntarily or involuntarily) or is decertified (including offsetting costs of relocating residents to home and community-based settings or another facility), projects that support resident and family councils and other consumer involvement in assuring quality care in facilities, and facility improvement initiatives approved by the Secretary (including joint training of facility staff and surveyors, technical assistance for facilities implementing quality assurance programs, the appointment of temporary management firms, and other activities approved by the Secretary).

(iii) Appointment of temporary management. In consultation with the State, the Secretary may appoint temporary management to oversee the operation of the facility and to assure the health and safety of

the facility's residents, where there is a need for temporary management while—

     (I) there is an orderly closure of the facility, or

     (II) improvements are made in order to bring the facility into compliance with all the requirements of subsections (b), (c), and (d).

     The temporary management under this clause shall not be terminated under subclause (II) until the Secretary has determined that the facility has the management capability to ensure continued compliance with all the requirements of subsections (b), (c), and (d).

     The Secretary shall specify criteria, as to when and how each of such remedies is to be applied, the amounts of any fines, and the severity of each of these remedies, to be used in the imposition of such remedies. Such criteria shall be designed so as to minimize the time between the identification of violations and final imposition of the remedies and shall provide for the imposition of incrementally more severe fines for repeated or uncorrected deficiencies. In addition, the Secretary may provide for other specified remedies, such as directed plans of correction.

     (C) Continuation of payments pending remediation. The Secretary may continue payments, over a period of not longer than 6 months after the effective date of the findings, under this subchapter with respect to a skilled nursing facility not in compliance with a requirement of subsection (b), (c), or (d), if—

     (i) the State survey agency finds that it is more appropriate to take alternative action to assure compliance of the facility with the requirements than to terminate the certification of the facility,

     (ii) the State has submitted a plan and timetable for corrective action to the Secretary for approval and the Secretary approves the plan of corrective action, and

     (iii) the facility agrees to repay to the Federal Government payments received under this subparagraph if the corrective action is not taken in accordance with the approved plan and timetable.

     The Secretary shall establish guidelines for approval of corrective actions requested by States under this subparagraph.

     (D) Assuring prompt compliance. If a skilled nursing facility has not complied with any of the requirements of subsections (b), (c), and (d), within 3 months after the date the facility is found to be out of compliance

with such requirements, the Secretary shall impose the remedy described in subparagraph (B)(i) for all individuals who are admitted to the facility after such date.

(E) Repeated noncompliance. In the case of a skilled nursing facility which, on 3 consecutive standard surveys conducted under subsection (g)(2), has been found to have provided substandard quality of care, the Secretary shall (regardless of what other remedies are provided)—

(i) impose the remedy described in subparagraph (B)(i), and

(ii) monitor the facility under subsection (g)(4)(B),

until the facility has demonstrated, to the satisfaction of the Secretary, that it is in compliance with the requirements of subsections (b), (c), and (d), and that it will remain in compliance with such requirements.

(3) Effective period of denial of payment. A finding to deny payment under this subsection shall terminate when the Secretary finds that the facility is in substantial compliance with all the requirements of subsections (b), (c), and (d).

(4) Immediate termination of participation for facility where Secretary finds noncompliance and immediate jeopardy

If the Secretary finds that a skilled nursing facility has not met a requirement of subsection (b), (c), or (d), and finds that the failure immediately jeopardizes the health or safety of its residents, the Secretary shall take immediate action to remove the jeopardy and correct the deficiencies through the remedy specified in paragraph (2)(B)(iii), or the Secretary, subject to section 1320a–7j(h) of this title, shall terminate the facility's participation under this subchapter. If the facility's participation under this subchapter is terminated, the State shall provide for the safe and orderly transfer of the residents eligible under this subchapter consistent with the requirements of subsection (c)(2) and section 1320a–7j(h) of this title.

(5) Construction

The remedies provided under this subsection are in addition to those otherwise available under State or Federal law and shall not be construed as limiting such other remedies, including any remedy available to an individual at common law. The remedies described in clauses (i), (ii)(IV), and (iii) of paragraph (2)(B) may be imposed during the pendency of any hearing.

(6) Sharing of information

Notwithstanding any other provision of law, all information concerning skilled nursing facilities required by this section to be filed with the Secretary or a State agency shall be made available by such facilities to Federal or State employees for purposes consistent with the effective administration of programs established under this subchapter and subchapter XIX, including investigations by State medicaid fraud control units.