**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 25-1669**

---

SLIGO CREEK CENTER,

        Petitioner,

    v.

UNITED STATES DEPARTMENT OF HEALTH & HUMAN SERVICES; ROBERT F. KENNEDY, JR., Secretary of the United States Department of Health and Human Services,

        Respondents.

------------------------------

AMERICAN HEALTH CARE ASSOCIATION; THE NATIONAL CENTER FOR ASSISTED LIVING,

        Amici Supporting Petitioner.

---

On Petition for Review of an Order of the Department of Health & Human Services. (A-21-12)

---

Argued: May 5, 2026                       Decided: June 5, 2026

---

Before RUSHING and HEYTENS, Circuit Judges, and FLOYD, Senior Circuit Judge.

---

Petition denied by published opinion. Judge Heytens wrote the opinion, which Judge Rushing and Judge Floyd joined.

---

**ARGUED:** Joseph L. Bianculli, HEALTH CARE LAWYERS, PLC, Deale, Maryland, for Petitioner. David L. Peters, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondents. Mark Emerson Reagan, HOOPER, LUNDY & BOOKMAN, P.C., San Francisco, California, for Amici Curiae. **ON BRIEF:** Brett A. Shumate, Assistant Attorney General, Michael S. Raab, Daniel Aguilar, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondents. David J. Vernon, Rachel L. Zacharias, Sheryl B. Xavier, HOOPER, LUNDY & BOOKMAN, P.C., Washington, D.C., for Amici Curiae.

2

TOBY HEYTENS, Circuit Judge:

Nursing homes "must comply with numerous statutory and regulatory requirements" to participate in—*i.e.*, receive reimbursement from—Medicare. *Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1, 6 (2000). When participating facilities fail to comply with those requirements, Congress has authorized the Secretary of Health and Human Services (HHS) to impose various consequences, including civil monetary penalties. See 42 U.S.C. § 1395i-3(h)(2)(B). Our primary question here: When the Secretary commences administrative proceedings against a Medicare participant seeking monetary penalties, does the Seventh Amendment guarantee that participant the right to a jury trial? We hold the answer is no. And because we see no other basis to disturb the challenged decision here, we deny the petition for review.

I.

Petitioner Sligo Creek Center ran a Medicare-participating nursing home in Montgomery County, Maryland. In 2015, county health officials informed petitioner that two facility employees and a former resident had been diagnosed with active tuberculosis (TB). The county officials met with petitioner's staff "to discuss [a] TB contact investigation and [a] response to the situation." JA 69. The officials claim they told petitioner's staff that the facility "was at high risk for TB transmission" and that—although the county would provide guidance and oversight—"[p]etitioner's staff w[ere] responsible for testing its residents for TB and for follow up treatment." *Id.*

Petitioner's internal policies included a protocol for TB testing and treatment consistent with standard recommended practices. The protocol stated that, once an active

3

case was confirmed, all residents should receive skin tests for TB and those who tested positive should then get a chest x-ray. A positive skin test and positive x-ray indicate active TB, while a positive skin test and negative chest x-ray indicate a latent TB infection. Although latent TB is asymptomatic and noncontagious, untreated latent TB can convert to active TB, which can be dangerous and even deadly. Petitioner's protocol required it to "proceed with evaluati[ng]" residents with positive skin tests and negative chest x-rays for latent TB treatment. JA 176–77. That requirement was consistent with federal, state, and county guidance recommending that nursing home residents with latent TB receive treatment "unless" it is "contraindicated or refused." JA 69 (first quote); JA 86 (second quote).

Petitioner followed the first few steps of this protocol. It administered skin tests, and more than two dozen residents tested positive. Petitioner then gave those residents chest x-rays. All chest x-rays were negative, indicating latent TB infections.

Under the protocol, petitioner was next supposed to "proceed with evaluat[ing]" those residents for latent TB treatment. JA 176; accord Petr. Reply Br. 12. But HHS later concluded—and petitioner now admits—that petitioner neither ordered nor administered latent TB treatment for residents with positive skin tests and negative x-rays.[1] Nor did petitioner explain in any of those residents' records *why* the facility was not administering latent TB treatment. Indeed, petitioner "conceded" to HHS that it never even "noted" any

---

[1] One such resident received latent TB treatment because an unaffiliated physician independently evaluated that resident for a kidney transplant and prescribed the treatment.

4

formal latent TB diagnosis "in any of the resident[s'] clinical records because no physician from the county or the facility rendered such a diagnosis." JA 97.

More than a year after the residents' negative chest x-rays, a state health agency received "a substantial allegation" about petitioner's "noncompliance" with Medicare's participation requirements. JA 72 (quotation marks removed). After an investigation, the state agency determined petitioner "failed to ensure timely follow up of the treatment and management of multiple residents who were identified at risk for exposure to a serious infectious disease" (that is, active TB) "and failed to record in [those] residents' clinical records the rationale for treatment/non treatment for" latent TB. *Id.* (alterations and quotation marks removed). The state agency thus concluded petitioner violated 42 C.F.R. § 483.65 (2016), which required each Medicare-participating nursing home to:

> establish and maintain an infection control program . . . under which it—(1) Investigates, controls, and prevents infections in the facility; (2) Decides what procedures, such as isolation, should be applied to an individual resident; and (3) Maintains a record of incidents and corrective actions related to infections.

§ 483.65(a) (2016).[2] The state agency also concluded petitioner's noncompliance created "immediate jeopardy," JA 72, which federal regulations define as "a situation in which [a] provider's noncompliance with one or more requirements of participation has caused, or is likely to cause, serious injury, harm, impairment, or death to a resident." 42 C.F.R. § 488.301. The HHS component that administers Medicare "concurred with" the state agency's conclusions, determined when the "immediate jeopardy" began and ended, and

---

[2] Although the regulation has since been revised, the parties agree the version quoted above was in effect during all relevant times.

"imposed a . . . per-day [civil monetary penalty]" on petitioner for that period. JA 73.

Petitioner requested and received a hearing in front of an administrative law judge (ALJ) to contest both "the finding of 'immediate jeopardy' noncompliance" with the relevant regulation "and the associated" fine. JA 73. The parties introduced "voluminous" evidence, including expert testimony. *Id*. The ALJ rejected petitioner's arguments, concluding: (1) petitioner had been noncompliant; (2) the noncompliance caused immediate jeopardy during the period HHS asserted; and (3) the fine was reasonable. Petitioner timely sought review from the HHS Departmental Appeals Board, which affirmed the ALJ's decision.

We have jurisdiction to review the Appeals Board's decision under 42 U.S.C. § 1395i-3(h)(2)(B)(ii), which incorporates the judicial review provisions contained in Section 1320a-7a(e). We determine de novo whether agency action complies with the Constitution. See, *e.g.*, *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 392 (2024). In contrast, the agency's "findings . . . with respect to questions of fact" are "conclusive" so long as they are "supported by substantial evidence on the record considered as a whole." 42 U.S.C. § 1320a-7a(e).

## II.

Petitioner chiefly argues that HHS's jury-less adjudication of this proceeding for monetary fines violated the Seventh Amendment as construed in *SEC v. Jarkesy*, 603 U.S. 109 (2024). Like the Third Circuit in an analogous case, we are "unpersuaded" that *Jarkesy* entitles petitioner to a jury trial in this context. *Axalta Coating Sys. LLC v. Federal Aviation Admin.*, 144 F.4th 467, 473 (3rd Cir. 2025).

6

The Seventh Amendment declares that "the right of trial by jury shall be preserved" "[i]n Suits at common law." U.S. Const. amend. VII. Under *Jarkesy*, we "conduct[] a two-part analysis" to determine whether petitioner was entitled to a jury trial here. *Axalta*, 144 F.4th at 473. *First*, we ask, as a "threshold issue," "whether this action implicates the Seventh Amendment" at all. *Jarkesy*, 603 U.S. at 120. *Second*—and only if the answer to that first question is yes—we ask "whether the 'public rights' exception to Article III jurisdiction applies." *Id.*; accord *Axalta*, 144 F.4th at 473, 475; see also *AT&T, Inc. v. Federal Commc'ns Comm'n*, 149 F.4th 491, 497–502 (5th Cir. 2025) (conducting this two-step analysis), cert. granted, 2026 WL 73092 (U.S. Jan. 9, 2026) (mem.) (No. 25-406).[3]

We make quick work of the first step. The government "does not contest that the money penalty challenged here 'implicates the Seventh Amendment.'" Gov't Br. 26 (quoting *Jarkesy*, 603 U.S. at 125); accord Oral Arg. 24:33–25:06. We thus decide this case on the assumption that *Jarkesy*'s first requirement is satisfied.

That leaves the second step: "whether the public rights doctrine justifies the administrative adjudication of [HHS]'s enforcement action." *Axalta*, 144 F.4th at 475. To be sure, *Jarkesy* described some of the Court's public rights "precedents" as "confusing,"

---

[3] During oral argument, petitioner suggested—echoing an amicus brief—that there may not even be a "'public rights' exception to Article III jurisdiction." *Jarkesy*, 603 U.S. at 120; see Oral Arg. 9:42–:55. That argument fails twice. *First*, petitioner failed to preserve any such argument by not making it in the opening brief. See *Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017). *Second*, the current "law on the books" recognizes a public rights exception and we as an inferior court have no authority to abrogate it. *Axalta*, 144 F.4th at 484 (Bibas, J., concurring); cf. *Jarkesy*, 603 U.S. at 127 (concluding that case "does not fall within the exception").

7

603 U.S. at 130 (quotation marks removed). But we agree with the Third Circuit that the *Jarkesy* Court "resolved the public rights question . . . in a notably uncomplicated way: by analogizing [*Jarkesy*'s] enforcement action to the action at issue in one public rights precedent—*Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989)—and distinguishing it from the enforcement action at issue in another—*Atlas Roofing Co. v. Occupational Safety & Health Review Commission*, 430 U.S. 442 (1977)." *Axalta*, 144 F.4th at 473–74. Taking the same approach, we ask whether the enforcement proceeding here "more closely resembles the essentially common law action in *Granfinanciera*" or "the action in *Atlas Roofing*." *Id.* at 475; see *id.* (noting *Jarkesy* "distinguished, but did not overrule, . . . *Atlas Roofing*").

*Jarkesy* explained the difference between *Granfinanciera* and *Atlas Roofing* and why the issue before it fell on *Granfinanciera*'s side of the line. In *Jarkesy*—as in *Granfinanciera*—Congress had "simply reclassified a pre-existing, common law cause of action." *Granfinanciera*, 492 U.S. at 60. The actions in both *Jarkesy* and *Granfinanciera*, though not identical to any common law causes of action, "target[ed] the same basic conduct as" well-recognized common law actions, "employ[ed] the same terms of art, and operate[d] pursuant to similar legal principles." *Jarkesy*, 603 U.S. at 134. In contrast, the statute authorizing the enforcement action in *Atlas Roofing* "did not borrow its cause of action from the common law," avoided "common law terms of art," and created a "self-consciously novel" type of action "'unknown to the common law.'" *Id.* at 136–37 (quoting *Atlas Roofing*, 430 U.S. at 461).

Like the Third Circuit in *Axalta*, we conclude petitioner had no Seventh Amendment

8

right to a jury trial here because this action "cannot be distinguished from the enforcement action considered in *Atlas Roofing*." *Axalta*, 144 F.4th at 475–76. As in *Atlas Roofing*, Congress did not merely repackage (or assign to a different party) a common law cause of action when it authorized proceedings like the one HHS initiated here. See *Jarkesy*, 603 U.S. at 135; cf. *Sun Valley Orchards, LLC v. U.S. Dep't of Lab.*, 148 F.4th 121, 124, 128–29 & n.4 (3rd Cir. 2025) (concluding claims brought under a statute authorizing the Secretary of Labor to sue on migrant laborers' behalf to "enforce[]" the laborers' "work contract[s]" sufficiently "resemble[d] [a] common law breach of contract" claim to distinguish the case from *Atlas Roofing*), cert. granted, 2026 WL 1127242 (U.S. Apr. 27, 2026) (mem.) (No. 25-966). Instead, Congress created a detailed series of new requirements that apply only to "skilled nursing facilit[ies]" that voluntarily participate in Medicare, and are administered by both state and federal government actors. 42 U.S.C. § 1395i-3(a) (defining that term); see § 1395i-3(a)–(k) (laying out the requirements); cf. *Jarkesy*, 603 U.S. at 137 (describing the statute authorizing the *Atlas Roofing* action as "self-consciously novel" "[i]n both concept and execution"). Those requirements are enforced by an intricate and "novel" enforcement scheme that would have been "unknown to the common law." *Jarkesy*, 603 U.S. at 138–39 (quotation marks removed); see *id.* at 137 (distinguishing schemes that merely "enable the Federal Government to bring or adjudicate claims that traced their ancestry to the common law"). Indeed, petitioner conceded at oral argument (see Oral Arg. 2:35–4:35), that it would have had no right to a jury trial had regulators refrained from seeking a monetary fine and instead withheld reimbursement, see 42 U.S.C. § 1395i-3(h)(2)(B)(i); "appoint[ed] temporary management

9

to oversee the operation of [petitioner's] facility," § 1395i-3(h)(2)(B)(iii); or even terminated its ability to participate in Medicare altogether, see § 1395i-3(h)(2)(A)(i). "*Atlas Roofing* binds us. And under its rule, this case involves public rights." *Axalta*, 144 F.4th at 482 (Bibas, J., concurring).

Seeking to avoid that conclusion, petitioner insists this enforcement scheme is analogous to unspecified (but nonetheless "traditional") common law tort "concepts," "obligation[s]," "standards of care," and "penalt[ies]." Petr. Reply Br. 4–6 (emphasis removed). We disagree.

The first reason for our disagreement involves the underlying basis for the relevant obligation. True, the HHS enforcement action here involved petitioner's failure to fulfill a duty. But that duty did not stem from any common law duty of care that applies to all people or those who participate in a particular type of activity. Instead, the duty here arose from petitioner's choice to participate in a voluntary government program (Medicare) where public funds are spent to achieve public benefits. The statute and regulation the agency concluded petitioner violated required it to "establish and *maintain*" an adequate infection control policy, 42 U.S.C. § 1395i-3(d)(3)(A) (emphasis added); accord 42 C.F.R. § 483.65 (2016), which includes "comply[ing] with [petitioner's] own policies and relevant state and local public health authority requirements." Amicus Br. 22. We see no indication that those policies and requirements—which can be quite detailed and "technical," *Almy v. Sebelius*, 679 F.3d 297, 302 (4th Cir. 2012) (quotation marks removed)—simply codify and restate general common law tort duties of care.

What is more, the obligations at issue here are—unlike common law torts—

10

untethered to any injury. "Suits at common law to vindicate private rights required both *injuria* (a legal wrong) and *damnum* (actual, concrete harm)." *In re: Express Scripts, Inc.*, ___ F.4th ___, ___ n.8 (4th Cir. 2026) [2026 WL 13555370, at *5, n.8]. Here, in contrast, Congress has authorized HHS to take various actions—including imposing monetary penalties—even when no resident has suffered or is at immediate risk of suffering harm. See 42 U.S.C. § 1395i-3(h)(2)(A)(i) (authorizing "any of the remedies described in subparagraph (B)" even absent immediate jeopardy). And even when (as here) HHS seeks greater penalties because a facility "immediately jeopardize[d] the health or safety of its residents," § 1395i-3(h)(2)(A)(ii), HHS *still* is not required to show that any resident suffered actual harm. See 42 C.F.R. § 488.301 (defining "[i]mmediate jeopardy" as "a situation in which the provider's noncompliance with one or more requirements of participation has caused, *or is likely to cause*, serious injury, harm, impairment, or death to a resident" (emphasis added)); see also § 488.845(b) (describing factors affecting the size of a penalty).

Thus, having considered the nature of the enforcement proceeding here, we conclude it is not sufficiently analogous to any common law tort to be properly characterized as just a "reclassified" common law tort action. *Axalta*, 144 F.4th at 474 (quotation marks removed).

Petitioner and its amici also briefly suggest the enforcement proceeding here can be analogized to a common law contract action. Once again, we disagree. To be sure, facilities must "execute a [p]rovider [a]greement" with the government "to participate in" Medicare. Amicus Br. 15 n.5. But as we just explained, Congress authorized enforcement actions like

11

this one for mere violations of statutory and regulatory obligations without requiring the government to incur any actual damages as a non-breaching party to a provider agreement. See 42 U.S.C. § 1395i-3(h). We know of no similar common law contract claims.

Like *Atlas Roofing*, this case involves "a new cause of action, and remedies therefor, unknown to the common law." 430 U.S. at 461. This case is also "markedly different from the fraud cause of action considered in *Granfinanciera* and *Jarkesy*." *Axalta*, 144 F.4th at 477. So, like the Third Circuit in *Axalta*, we conclude that HHS's ability "to enforce" the statutory and regulatory obligations at issue here "is a public right that Congress may assign to the executive branch for adjudication without offense to the Seventh Amendment." *Id.*[4]

### III.

Petitioner's remaining challenges—that HHS acted arbitrarily or capriciously and that the record does not support the agency's decision—also fail. HHS concluded that: (1) the then-applicable version of 42 C.F.R. § 483.65 required petitioner to follow its internal infection control policy; and (2) petitioner violated the policy by failing to "proceed with evaluati[ng]" its residents with positive skin tests and negative x-rays for latent TB treatment. JA 79–80. Both conclusions survive judicial scrutiny.

Start with petitioner's assertion that HHS's decision was arbitrary or capricious because it penalized petitioner's failure to meet "new[,] *implied* regulatory requirements." Petr. Br. 45; see 5 U.S.C. § 706(2)(A). Petitioner insists that, under the relevant statute and

---

[4] Given our holding that petitioner had no right to a jury trial, we need not reach petitioner's "corollary" contention that HHS "should have held off seizing—or should have returned"—certain funds pending any such trial. Petr. Br. 44.

regulations, the only thing it had to do was follow county health officials' orders, and because the county issued no orders, it fulfilled those obligations by doing nothing. We disagree. The statute and regulations required petitioner not just to "establish" "an infection control program" but also to "maintain" that program. 42 U.S.C. § 1395i-3(d)(3)(A); 42 C.F.R. § 483.65 (2016). Petitioner does not dispute HHS's conclusion that its program *required* petitioner to "evaluat[e]" residents with positive skin tests and negative x-rays "for" latent TB treatment. JA 176; see Petr. Reply Br. 12. Because petitioner thus had notice of its obligation to conduct those evaluations, HHS did not impose any impermissible "ad hoc" requirements. Petr. Br. 46 (quotation marks removed); cf. *Golden Living Ctr. – Mountain View v. Secretary of Health & Hum. Servs.*, 832 Fed. Appx. 967, 974–83 (6th Cir. 2020) (holding it was arbitrary and capricious to penalize a facility for "fail[ing] to consider adding additional staffing" because no statute or regulation—either expressly or through incorporation—required facilities to do so).[5]

The record also contains "evidence that a reasonable mind might accept as adequate to support [HHS's] conclusion" that petitioner did not, in fact, proceed with the required evaluations. *Putnam Ctr. v. United States Dep't of Health & Hum. Servs.*, 770 Fed. Appx. 630, 638 (4th Cir. 2019) (quotation marks removed) (explaining 42 U.S.C. § 1320a-7a(e)'s

---

[5] In its reply brief, petitioner also argues its policy's direction to "proceed with evaluation" for latent TB treatment for residents with positive skin tests and negative x-rays did not require petitioner to "*do* the[] evaluations." Petr. Reply Br. 11 (emphasis added). For one thing, petitioner forfeited that argument by failing to raise it in its opening brief. See *Grayson O*, 856 F.3d at 316. For another, we disagree. The policy is internal and thus governs only petitioner, directing it (and only it) to proceed with—in other words, conduct—such evaluations.

"substantial evidence" standard). As the ALJ found (and petitioner did not contest), residents with positive skin tests and negative x-rays had "clinical records" that lacked *any* "note[s]" of their latent TB diagnoses. JA 97. Petitioner also "provided no evidence that [its] attending physicians or nurse practitioners were asked to evaluate th[ose] residents" "for [latent TB] treatment or asked to order [such] treatment; and if not, why not." JA 98. But see 42 C.F.R. § 483.65(a)(1) (requiring facilities to "maintain an infection control program" "under which" they "[m]aintain[] a record of . . . corrective actions related to infections"). We thus reject petitioner's assertion that the agency's decision was not supported by substantial evidence.

*     *     *

The Seventh Amendment did not guarantee petitioner the right to a jury trial here, and HHS's decision was supported by substantial evidence and neither arbitrary nor capricious. The petition for review is

*DENIED.*

14